No. 20,055.

JOHN G. HENDRIE, AETNA CASUALTY AND SURETY COMPANY, and JOHN G. HENDRIE COMPANY *v.* THE BOARD OF COUNTY COMMISSIONERS OF RIO BLANCO COUNTY.
(387 P. [2d] 266)

Decided November 12, 1963.     Rehearing denied December 23, 1963.

Messrs. Fugate, Mitchem, McGinley & Hoffman; Messrs. Hindry, Erickson & Meyer, for plaintiffs in error.

Mr. Robert Delaney, Mr. Kenneth Balcomb, for defendant in error.

*In Department.*

Opinion by Mr. Justice Sutton.

This is primarily a case relating to the proximate causation of damage to a swimming pool constructed

under contract by the John G. Hendrie Company for defendant in error in Rangely, Colorado. We shall refer to the parties by name or as they appeared in the trial court.

The Commissioners sued both the Hendrie Company and John G. Hendrie individually. Hendrie held the franchise for Paddock Swimming Pools and was joined because he had assertedly acted in both his personal and corporate capacities in the transaction. No material error is claimed here as to this point and both of them will be referred to as "Hendrie" wherever appropriate. The Aetna Casualty and Surety Company was joined as surety on the performance bond. Other parties were joined in the trial court and were dismissed on motion and they are not involved in this writ of error.

The principal problem, shorn of its many and devious ramifications, running through 2799 folios and numerous exhibits, is whether there is evidence to sustain the liability of Hendrie as determined by the judgment of the trial court. If liability is upheld, then subsidiary issues involving the measure of damages, the question of whether there can be interest on the claim before judgment, and liability vel non of the surety must be resolved.

The controversy arose as follows: In 1955 the Commissioners, pursuant to statute (C.R.S. '53, 114-2), appointed a joint recreation committee for the towns of Rangely and Meeker. The objective was to procure the construction of public swimming pools in both communities. Sufficient funds being available for only one pool of sufficient size it was decided to build it in Rangely.

Hendrie, as well as other contractors, conferred with the Committee about the project. Following thorough investigation of the problem and consideration of the types of pools available, the Committee decided to use specifications and designs for a gunite type concrete

pool. Bids were called for and Hendrie was the sole and successful bidder.

A major problem, well known to both Hendrie and the Committee was the fact that much of the soil at Rangely is very hazardous to build on, the evidence being that the soil at the pool site consists of up to forty feet of sandy and clayey silt with occasional thin lenses of silty sand and gravel. The silt is dry, porous and firm in its natural state but when wetted it becomes soft and compressible due to a water soluble sulphate. This unstable element apparently goes into solution when water is applied to it, destroying its solidity.

It appears that Hendrie, with knowledge of the soil problem, nevertheless represented to the Committee (which incidentally was the agent of the Commissioners) that a gunite pool, as he would construct it, would withstand the particular soil conditions. In fact he gave a separate ten year written warranty against defects due to leakage and cracking due to material and workmanship, in addition to his general contract warranty.

During the contract negotiations some changes were ordered by the Committee. Two of the changes should be mentioned for they relate to the construction problem involved here. The first is that some of the copper piping was changed to plastic pipe. The second is that the gunite was increased from four to six inches in order to better protect against the soil condition. Also, during the course of construction a few changes, not related to the problem at hand, were ordered in the plans and specifications by the two Committee representatives who were constantly checking on the work. The contract itself in one part provided that the owner (i.e. Commissioners) was to be responsible for among other things "underground and surface water, filled ground exceeding three feet, hard formation requiring for its removal the use of pneumatic hammers or blasting, or other unknown obstructions or unknown soil conditions."

The pool area was levelled by the county, the pool built and paid for in 1956.

Use of the pool after its dedication on August 12, 1956, until it was closed for the winter in September 1956 was evidently satisfactory. Hendrie proposed to winterize it; however the county chose to employ local labor for this work. Hendrie furnished some material and instructions on how the work was to be done.

The process of winterizing required that the pool be drained and the pipes cleared of water. In order to do this, the water was drained from the pool and air pressure applied to drain the pipes. The machine used for this was supplied by a local firm, and pressure of 100 pounds p.s.i. was used. The pipes were then plugged and the pool refilled. It remained in this condition until the late spring when arrangements were made to reopen it. It was then discovered that during the winter a plug in a pipe running between the main pool and the wading pool had fallen out, allowing water to enter the pipe, which froze and caused the pipe to shatter. This was corrected and the pool put into operation.

As the summer advanced a problem developed with circulation of the water and another leak in the pipes was discovered and corrected. By the first of August 1957 the lifeguard noticed that the pool was losing too much water. The Committee ordered the pool drained and cracks in the structure were discovered. These defects were located at the south-east end of the pool, on both the bottom and one side. On August 11, 1957 Hendrie was contacted and informed of the difficulty. He sent a supervisor to Rangely who broke into the concrete on the sides and discovered a leaking pipe, but it was impossible to tell whether he had broken the pipe himself or if it had been in that condition before.

The parties met to discuss what steps should be taken. Hendrie stated that he would repair the pool, but the Commissioners would have to pay for the material. The Commissioners then retained the services of an engi-

neering firm which in turn examined the pool to see why it was leaking and had soil tests made. The firm's recommendation was that the pool be removed and replaced by a different type of construction which was done. The main basis for this advice was that the condition of the soil required that this type of structure be placed on caissons so that moisture in the ground would not cause settling.

This action was brought to recover the cost of the new pool. Trial was to the court. The two principal witnesses for the plaintiff were the men from the Recreation Committee who had supervised the work on the pool. The substance of their testimony was that the pipes used by Hendrie broke and permitted water to get under the pool, which caused the soil to dissolve and the pool to crack. They stated that Hendrie had represented to them that the plastic pipes were fit for the job and that the gunite construction of the pool would resist cracking even under the most adverse conditions. In addition, they asserted that Hendrie had not installed a hydrostatic relief valve called for in the contract which would have prevented water from accumulating under the pool. One of these witnesses, William Elm, was a plumber by trade and stated that the condition of many of the pipes showed that they had been poorly "sweated," which meant that they could have leaked at the joints. It should also be noted that when the original pool was removed the soil under where it is alleged these pipes leaked was found to have dissolved in places. It was asserted that this condition caused the settling and cracking of the pool structure.

The two chief witnesses for Hendrie were Ray Smith, who supervised the installation of the pool for his company, and Professor James O. Ball, an engineer from the Colorado School of Mines. Smith testified that during the course of the construction of the pool the plumbing system had been tested and the pipes had not leaked. In addition, when he went to the pool in the spring of

1957 a considerable amount of water had collected around it, as it had been a wet winter and the drainage in the area of the pool was poor. He stated that a ditch had been dug by the county in the area of the pool for the purpose of drainage, but in his opinion this was not adequate. Smith also stated that the plug falling out of the pipe line and the resultant freezing causing the pipe to shatter had added water which aggravated the problem.

Professor Ball stated, in answer to a hypothetical question, that the cause of the failure was either permitting the pool to remain empty of water for some length of time, or, allowing the pool to rest on a structure of mud, caused by the water remaining around the edge of the pool. To a direct question on the method of winterizing the pool Professor Ball stated that the 100 pounds of pressure p.s.i. used to blow out the pipes had been too great as the pipes were not constructed to take that much, and they could have been shattered by the treatment. Both Hendrie's witnesses stated that a hydrostatic relief valve would have made no difference because the problem was not water but mud, which they contended would have stopped up the valve and made correct operation impossible.

It appears that when the pool was removed there was evidence that many of the pipes had been broken, shattered and sheared. The evidence, however, as to what caused this damage was inconclusive, and it could have occurred during the removal of the pool as well as before the cracking had developed.

At the conclusion of the trial, judgment was given in favor of the plaintiff and against the defendants. The following is a pertintent part of the court's findings:

"There is no question that excessive moisture under the pool shell caused the original pool to fail and become unusable, necessitating reconstruction of the facility. The pool's shell was placed upon backfill instead of undisturbed soil as required by the plans. We believe

that excessive water accumulated under the shell by reason of the failure of defendant Hendrie to install the hydrostatic relief valve at the main drain in the low part of the swimming pool to allow escapage of such water. The plans called for a relief valve. It was not installed. The water which collected under the shell of the pool came from leaky copper joints in the circulatory system. The joints were not properly sweated with solder to form a seal which would prevent leakage of water. Some of such joints were so loose that they could be pulled apart. The water which accumulated from the leaky joints was the cause of the damage to the swimming pool. * * *

"The defendant Hendrie was fully informed concerning the instability of the Rangely soil. The subject was frequently discussed. Hendrie assured the plaintiff that a gunite pool would withstand the conditions. * * *

"We conclude that the failure and consequent unusability of the original swimming pool in controversy were directly caused by the breaches of contract by the defendant John G. Hendrie mentioned herein and that he is liable to the plaintiff in damages for such violations. * * *

"The measure of damages herein is the cost of demolishing the original swimming pool and reconstruction thereof, using all salvageable materials and equipment, less the cost of installation of caissons not contemplated by the contract for the first pool."

Though Hendrie challenges the above findings of fact, a review of the record and exhibits, part of which are mentioned herein, leads us to the conclusion that there is adequate evidence to support a finding of liability as against Hendrie.

The trial court heard the witnesses, examined the premises and concluded that it was the leaking of pipes installed by Hendrie and his failure to install the relief valve that caused the structure to fail. There being evidence that these two factors were the proximate

cause of the trouble the judgment as to liability must be sustained.

Hendrie urges that the facts here are similar to those in *Mosko v. Walton,* 144 Colo. 602, 358 P. (2d) 49 (1960). That case also involved a building settling in Rangely. It was there held that no causal connection was shown between a leaking pipe on a neighbor's land and the cracked building, due to other possible causes of the damage. This fact situation is different from that in *Mosko* in that here it was shown that an actual breach of a construction contract and warranty occurred in failing to install the hydrostatic valve and that pipes installed by Hendrie leaked under the pool dissolving the soil which caused the structure to settle and crack.

Turning next to the amount of damages, as above stated, when Hendrie was informed that the pool leaked he offered to repair it if the Commissioners furnished the materials. He now contends he could have done all repairing for between $1,800.00 and $1,900.00.

The original contract was for $51,245.00. The trial court found from the evidence that the Commissioners were justified in not trying to repair the pool itself after an engineering survey and soil test disclosed it was not feasible. It seems needless to point out that with both dissolved soil and broken pipes beneath the concrete pool such course appeared to have been a necessary conclusion. The court also found, without specifying the exact value thereof, that "All materials and equipment of the old pool that could be salvaged * * * were used in the reconstruction work." Further, that it cost $2,250.37 to demolish the old pool; $36,031.20 to construct a new one resting on caissons (which pool the evidence discloses has since served satisfactorily); and $6,514.26 for new engineering services. All this made a total of $44,795.83 with the cost of the caissons which came to $3,907.00 and which cost the trial court subtracted leaving the sum of $40,888.83. The court then noted that the latter total was $372.60 more than sought

in the complaint, reduced it by that sum and further reduced it by a setoff due on a different contract of $4,185.41 with interest. The judgment was for the balance of $36,703.42 with interest from date of filing the complaint.

Complaint is made by Hendrie as to three of these items:

(1) That no award should be made for the engineering services;

(2) No allowance was made for the parts of the original contract work not replaced such as a small bathhouse and a cement walk; and,

(3) That no interest should have been allowed.

We will consider these items seriatim.

First, as to the engineering services we conclude that the trial court was partially in error. It is indeed true that a study had to be made to determine what caused the pool to lose water. That is a valid expense against Hendrie. However, that part of the $6,514.26 attributable to soil tests and for designing a new and different pool are expenses not connected with the original contract and should have been borne by the Commissioners even before the unfortunate contract involved here was entered into. By allowing the total against Hendrie the Commissioners are placed in a more favorable position than if they had not made a contract with Hendrie in the first place. This item of damages thus must be broken down and only that part necessary to determine the cause of the failure awarded the Commissioners.

Second, as to what allowance should be made for the value of the original contract work not replaced, a different problem arises. Obviously, if the Commissioners built a better pool or more expensive pool the second time any extra costs thereof are not chargeable against Hendrie.

There was no finding as to the actual value of

salvage and of prior construction retained by the County. It appears that the replacement pool was cheaper to install than another Paddock pool that would have the necessary safeguards. This being so, we conclude that the method used by the trial court to determine the amount of damages, necessarily includes an allowance for that part of the original work not replaced or salvaged, viz., the difference between the original price of $51,245.00 and the new construction cost of $36,031.20. No error occurred as to this point.

■ Third, as to the matter of interest allowed. Hendrie contends that if he is liable that this is an unliquidated claim for a breach of contract and does not come within any of the situations enumerated in C.R.S. '53, 73-1-2. He points out that in Colorado interest is a creature of statute, citing among other authorities *Denver, S.P. & P. R.R. Co. v. Conway,* 8 Colo. 1, 16, 5 Pac. 142 (1884), and *Weaver v. First National Bank of Limon, et al.,* 138 Colo. 83, 96, 330 P. (2d) 142 (1958). In this he is correct and no interest should have been allowed before judgment.

Turning now to the issue of liability of the surety. Aetna contends that Hendrie personally executed the bond for a contract to be dated May 5, 1956, and that the payee was the Committee which had no legal standing.

Suffice it to say that we have examined both the record presented and the exhibits in this connection and we conclude there is no merit in this contention.

■ Aetna knew that Hendrie was president of the construction company and that he was acting for it and Aetna knew or was bound to know the statutory limits of the Recreation Committee and that it was acting for the Board of County Commissioners. As to the contract date the fact that it was dated the 10th whereas the bond application was dated the 5th, is immaterial. It was the exact contract which the surety meant to cover

and no change was made in the contract itself as to coverage, conditions or known parties.

The judgment must be affirmed as to the liability of Hendrie and of Aetna, however, it must be reversed as to the' amount thereof and the cause remanded with directions to the trial court to compute the damages as follows:

| | |
|---|---|
| Engineering chargeable | |
| to Hendrie ..................$ | (To be determined) |
| Demolition of pool..............$ | 2,250.37 |
| Reconstruction of pool | |
| (less caissons) ..............$ | 32,124.20 |
| Total ....................$ | (To be determined) |
| Less offset .................. — $ | 4,185.41 |
| Total due (without interest | |
| before judgment) .......$ | (To be determined) |

Corrected judgments to enter in the final amount when determined as above.

MR. JUSTICE DAY and MR. JUSTICE PRINGLE concur.