**ROCKY MOUNTAIN TOOL & MACHINE CO., Inc., Appellant,**

v.

**TECON CORPORATION, United States Fidelity & Guaranty Company, and Hartford Accident & Indemnity Company, Appellees.**

**HARTFORD ACCIDENT & INDEMNITY COMPANY, Appellant,**

v.

**TECON CORPORATION, United States Fidelity & Guaranty Company, and Rocky Mountain Tool & Machine Co., Inc., Appellees.**

**TECON CORPORATION, Cross-Appellant,**

v.

**ROCKY MOUNTAIN TOOL & MACHINE CO., Inc., Hartford Accident & Indemnity Company, and United States Fidelity & Guaranty Company, Cross-Appellees.**

Nos. 8178–8180.

United States Court of Appeals
Tenth Circuit.

Dec. 28, 1966.

Rehearing Denied in Nos. 8179 and 8180
Jan. 30, 1967.

Richard L. Banta, Jr., Englewood, Colo. (Shivers, Banta & McMartin, Englewood, Colo., and Emory L. O'Connell, Denver, Colo., on the brief), for Rocky Mountain Tool & Machine Co., Inc.

W. Robert Ward, Denver, Colo. (H. Gayle Weller, Denver, Colo., on the brief), for Hartford Accident & Indemnity Co.

Charles H. Haines, Jr., Denver, Colo. (Grant, Shafroth, Toll & McHendrie and Peter J. Crouse, Denver, Colo., on the brief), for Tecon Corporation and United States Fidelity & Guaranty Co.

Before LEWIS, BREITENSTEIN and HILL, Circuit Judges.

DAVID T. LEWIS, Circuit Judge.

This action was brought under the Miller Act, 40 U.S.C. §§ 270a, 270b, by the United States for the use and benefit of Rocky Mountain Tool & Machine Co., Inc. (Rocky Mountain) against Tecon Corporation (Tecon) and involves a complex of claims resulting from the construction of a Bureau of Reclamation project designated as the "Blue Mesa Dam and Power Plant" and located near Gunnison, Colorado. Rocky Mountain's first claim asserts a sum in excess of $346,000 to be recoverable from Tecon as the prime contractor on the project through Rocky Mountain's second tier sub-contract with Dearborn Machinery Movers Company, Inc. (Dearborn), a first tier subcontractor of Tecon's. Rocky Mountain also sought damages for materials furnished and labor performed under a second contract made directly with Tecon and further damages for the wrongful termination of that contract. Rocky Mountain's total claims approximate $2,000,000. Tecon counterclaimed against Rocky Mountain and its surety, Hartford Accident & Indemnity Co. (Hartford), for breach of contract, claiming damages of $500,000. Hartford asserted an independent defense on its bond. Jurisdiction of the expanded claims, where the Miller Act is not applicable, is based upon diversity of citizenship, 28 U.S.C. § 1332.[1]

The case was tried to a jury and resulted in verdicts denying recovery to Rocky Mountain on the Miller Act claim and also on the claim for wrongful termination of Rocky Mountain's direct contract with Tecon but awarding to Rocky Mountain damages in the sum of $47,-884 for labor and materials furnished to Tecon between December 1, 1962 and January 10, 1963. The jury also returned verdicts granting Tecon damages of $225,000 against Rocky Mountain for breach of contract and against Hartford in the sum of $150,000. The trial court directed the entry of judgment on the verdicts including interest on the monetary award from the date of the filing of the claim by the party obtaining a verdict. After consideration of various post-trial motions, final amended judgment was entered which raised the judgment against Hartford from $150,000 to $177,116, the latter sum being equal to the net recovery found against Rocky Mountain, Hartford's principal. Interest on the monetary awards was allowed only from and after the date of the verdicts. By way of appeal and cross appeal, the parties now assert error in every portion of the judgment that is adverse to their respective interests.

A consideration of the precise appellate issues seems to dictate a somewhat detailed narrative of the factual development of the parties' controversy. In April 1962, the Bureau of Reclamation awarded to Tecon the prime contract for the construction of the Blue Mesa Dam. Tecon awarded a sub-contract to Dearborn covering the portion of the project that included construction and installation of a steel overflow pipe and penstock manifold which would carry water from the reservoir to the power plant at the base of the dam. Dearborn in turn, with Tecon's approval, awarded a second tier sub-contract to Rocky Mountain for the fabrication and partial installation of the structures contemplated by the first tier sub-contract between Tecon and Dearborn. Rocky Mountain provided Dearborn a performance bond in the amount of $825,000, issued by Hartford as surety on the work to be performed under the Dearborn-Rocky Mountain sub-contract.

In June 1962, Rocky Mountain submitted to Dearborn a schedule of pay estimates which was accepted by Dearborn and was satisfactory to Tecon as a contractually binding payment and progress schedule. Rocky Mountain later disputed the binding nature of the schedule, but there is evidence in the record to support the conclusion that Rocky Mountain

1. Rocky Mountain's assignee, the Littleton National Bank of Littleton, Colorado, and Tecon's surety, United States Fidelity & Guaranty Company, are parties in the case but present no separate interests.

did in fact consider itself so bound for at least the period in which the second tier sub-contract with Dearborn was in effect.

In August 1962, after Rocky Mountain had expended considerable sums of money in preparation of a fabrication site, Dearborn became involved in bankruptcy proceedings in Detroit, Michigan. Being apprehensive of the effect that these proceedings might have upon Dearborn's respective contractual obligations, Tecon and Rocky Mountain entered into an agreement whereby Rocky Mountain or its assignee would receive payments directly from Tecon for work performed under the Dearborn-Rocky Mountain sub-contract. It was also agreed that in the event the trustee in bankruptcy should terminate the Tecon-Dearborn sub-contract Rocky Mountain would complete its work on the project under a direct sub-contract with Tecon. The prospective Tecon-Rocky Mountain sub-contract provided:

"Sub-contractor [Rocky Mountain] shall perform its work in such manner as to meet the applicable portions of the attached payment and progress schedule."

Attached was the Tecon-Dearborn payment and progress schedule that had been based partially upon the schedule of pay estimates submitted by Rocky Mountain to Dearborn. Also in the prospective sub-contract was a paragraph which provided:

"In the event the Sub-Contractor fails, neglects, or refuses to prosecute the work or any separable part thereof in accordance with the requirements, specifications and regulations provided under the said Prime Contract, or in the event the Sub-Contractor fails to maintain a progress schedule, which, in the opinion of the Contractor will assure completion of Sub-Contractor's work, or any part thereof at its option, within the time required by said Contractor, then the Contractor may, by written notice to the Sub-Contractor, terminate his right to proceed with the work, or such part thereof as is not being performed as required. In such event, the Contractor shall have full power and authority, without process of law and without violating this agreement, to take the prosecution of work out of the hands of the Sub-Contractor and complete it with its own forces, or contract with other parties for its completion, or use other measures as in the Contractor's opinion are necessary for its completion, including the use of equipment, plant and other property of the Sub-Contractor on the work, as hereinafter provided. Should the expense incurred by the Contractor in taking over and completing the work be less than the sum that would have become payable under this agreement if said work had been completed by the Sub-Contractor, then the Sub-Contractor shall be entitled to the difference, and should such expense exceed the said sum, then the Sub-Contractor and Sub-Contractor's surety shall be liable to the Contractor for the amount of such excess."

Rocky Mountain continued its operations under the second tier sub-contract with Dearborn until the end of November 1962 when the trustee in bankruptcy terminated the first tier sub-contract between Dearborn and Tecon. During that period there were numerous communications between the parties concerning the quality and quantity of Rocky Mountain's work. Rocky Mountain expressly recognized that its work was behind schedule but promised to use the winter months when no work was planned as a time for catching up.

On December 3, 1962, Tecon advised Rocky Mountain that by virtue of the trustee's action the Tecon-Rocky Mountain sub-contract of August 1962 had come into effect subject to the condition that Rocky Mountain furnish a performance bond in the amount of $500,000. At the same time, Tecon advised Rocky Mountain that the rate of progress of its work was "grossly inadequate" and that unless there was substantial improvement demonstrated within twenty days, the

direct sub-contract would be terminated pursuant to the applicable contract provision. Two weeks later, Rocky Mountain replied that it had never committed itself to a performance progress schedule and suggested that the parties get together to straighten out their differences. The twenty-day period expired with neither party taking any action to terminate or re-affirm the new sub-contract. At the end of December 1962, Hartford executed a new bond in the sum of $500,000 covering the work to be performed under the Tecon-Rocky Mountain sub-contract.

On January 3, 1963, Tecon sent Rocky Mountain a telegram calling the latter's attention to its failure to bring the work up to an acceptable progress schedule. The telegram requested as a condition to the continuing effect of their sub-contract that Rocky Mountain furnish by January 15, 1963 a bar graph of the weekly progress that could be assured until completion of its work. On January 9 and 10, 1963, representatives of Tecon and Rocky Mountain met for the purpose of working out a progress schedule that would be acceptable to both parties. The record is not clear whether Rocky Mountain refused to commit itself contractually to any progress schedule or simply refused to commit itself to the schedules proposed by Tecon. In any event, the meetings ended with Tecon declaring that it was invoking its right of termination. Thereafter, Tecon directed Rocky Mountain to remove most of its equipment from the job site and undertook to complete the work that remained undone at the date of termination.

Although the appellate claims and arguments of the parties are directed and interrelated to the total case, some categorization of the issues is necessary. We begin, then, with a consideration of Rocky Mountain's assertion that the trial court erred in not allowing recovery as a matter of law on its Miller Act claim against Tecon. The verdict of the jury denied such recovery when the claim was submitted as a disputed issue of fact.

Rocky Mountain's evidence showed that during the period of job performance that ended on November 30, 1962, the date that the trustee in bankruptcy terminated Dearborn's contractual obligations on the Blue Mesa project, it had paid out in expenses the sum of $501,134 and had received in contract payments the sum of $343,346. The unpaid difference, $157,788, is the amount Rocky Mountain asserts is undisputably due as a Miller Act claim. We consider the contention of Rocky Mountain to be an over-simplification of the issue.

 The measure of recovery by a sub-contractor against a prime contractor with whom no direct contractual relationship has existed is limited under the Miller Act to the reasonable value of the labor and materials furnished which furthers the prosecution of the project work. St. Paul-Mercury Indemnity Co. v. United States for the Use of Jones, 10 Cir., 238 F.2d 917; Southern Painting Co. of Tenn. v. United States for the Use of Silver, 10 Cir., 222 F.2d 431. Proof of cost is properly admitted in most instances to probe the reasonableness of value furnished or performed but is not beyond the realm of dispute. Here, the testimony of Rocky Mountain's witnesses as to expense was weakened on cross examination by questions relating to the allocation of costs incurred and continuing before and after the cut-off date of November 30. So, too, the relation of cost to value was negatived by evidence of the sub-contractor's failure to meet progress and quality requirements and by evidence showing the necessity and cost of ultimate take-over in comparison with Rocky Mountain's contract prices. Rocky Mountain's total contract price was $825,000 and Tecon's cost after take-over exceeded $900,000. Although the verdict of the jury reports the decision of an issue in isolation, its correctness must be examined by the total evidence submitted to the jury and its consideration of the entire case. So viewed, we believe the evidence well supports the jury's verdict that Rocky

Mountain had been paid the full value of its work up to November 30, 1962.

Rocky Mountain also asserts that the jury should not have been allowed to consider evidence of any deficiencies in its work performed prior to November 30 because Tecon waived such deficiencies by allowing Rocky Mountain to continue work after November 30 under direct contract. We find nothing in the record to support such a conclusion. Although, as will later appear, the circumstances that existed at the time Tecon effectuated the direct contract have legal significance, such circumstances do not dictate the imposition of a retroactive liability upon Tecon that would not otherwise exist.

Rocky Mountain's second claim in the District Court was for damages and lost profits under its sub-contract with Tecon on grounds that Tecon wrongfully terminated the sub-contract after waiving all objections to any prior deficiencies in Rocky Mountain's work. As mentioned previously, the waiver is said to have occurred when Tecon allowed the work to proceed under its direct sub-contract with Rocky Mountain after Dearborn's sub-contracts were terminated by the trustee in bankruptcy. The jury's verdict was for defendant Tecon on the claim for wrongful termination, but it awarded Rocky Mountain $47,884 for labor and materials furnished from December 1, 1962 to January 10, 1963. These two verdicts were in accord with the following instruction given by the District Court:

> "If the jury were to conclude that there was a waiver by Tecon in December or early January, and that the contract was properly terminated, the verdict should be for the plaintiff as to its claim for materials and labor under Exhibit 7 which is forty-some thousand dollars."

Rocky Mountain now asserts that the verdict against it on the claim of wrongful termination is fatally inconsistent with the verdict awarding it $47,884, for the latter is based upon an express finding of waiver by Tecon. Accordingly, says Rocky Mountain, the case must be sent back for a new trial. Tecon, on the other hand, contends that there is a complete absence of evidence to support the verdict for labor and materials furnished by Rocky Mountain from December 1, 1962 to January 10, 1963, and that, in any event, Tecon is entitled to have this award included in the cost of completion under the verdict on its counterclaim.

■ As far as Rocky Mountain's objections are concerned, its failure to keep its work up to an acceptable quantity and quality constituted a continuing breach of an obligation which was not necessarily excused permanently just because Tecon elected to go on with the new sub-contract. See Williston on Contracts § 688. Nor was there such a waiver of this continuing breach that would lead Rocky Mountain to believe that its defective performance would be acceptable in the future. Tiedman v. American Pigment Corp., 4 Cir., 253 F.2d 803, 807, and authorities cited therein; see also S. D. Hicks & Son Co. v. J. T. Baker Chemical Co., 2 Cir., 307 F.2d 750, 752. Both before and after the sub-contract with Tecon came into effect Rocky Mountain had full notice that all other parties concerned were dissatisfied with the progress and quality of its work and that Tecon was apt to terminate unless dramatic improvements were made. Rocky Mountain was also made fully aware that its right to continue on the project would be conditioned upon its ability to put the work on the schedule appended to its direct sub-contract with Tecon. Tecon's total waiver, if any, could not have matured until Rocky Mountain put the work on the schedule required by their sub-contract. This it clearly did not do. Thus, the jury's conclusion that Tecon's termination was not wrongful has ample support in the record.

■■ This does not foreclose a further finding by the jury that Tecon was liable to Rocky Mountain for the labor and materials furnished from December 1, 1962 to January 10, 1963. Nor must

the verdict for the reasonable value of these items be included in Tecon's cost of completion. As explained by the District Court:

"[T]he amount awarded was expended by Rocky in reliance on the assurance of Tecon that Rocky would be allowed to finish the contract.[2] It was, therefore, allowed on the theory of promissory estoppel and was not within the terms of the contract. The right to terminate undoubtedly arose as soon as the contract became activated. The right was not, however, exercised until Rocky had substantially and detrimentally changed its position. This is not, therefore, properly a 'cost of completion' which can be claimed by Tecon."

Although the quoted remarks of the trial court might now be termed a rationalization, we think it clear that the case was such as to warrant submission to the jury of designated issues, to be determined from the total evidence affecting the parties' interrelations but severally designated by separate verdicts. The case was so submitted and the verdicts, though procedurally unusual, are not inconsistent. The verdicts of the jury reflect its apparent view that Rocky Mountain was failing in its contractual obligations prior to November 30 and had been paid for the value of its work to that date; that Rocky Mountain, relying on the expectations of the direct contract with Tecon, expended $47,884 between December 1, 1962 and January 10, 1963 to its detriment; that such actual sum should be recoverable although the inducement of the Tecon contract did not justify the continuation of Rocky Mountain's unsatisfactory progress and did justify the termination of the contract by Tecon. The verdicts reflect and the evidence justifies such views.

Consistent with the jury's determination that Rocky Mountain was not entitled to recover for the alleged wrong-

ful termination by Tecon of the direct contract was the jury's verdict allowing recovery to Tecon on its counterclaim for the cost of taking over and completing the work. Damages were assessed against Rocky Mountain in the sum of $225,000. From this verdict the trial court deducted the counter-verdict for Rocky Mountain and entered a net verdict of $177,116, disallowing interest from date of the counterclaim to date of verdict. Tecon objects to the downward adjustment of the interest portion of the net verdict because no objection was made within ten days after original entry of judgment.

It is settled that interest questions in a suit on a contract brought in federal court are to be determined by state law, whether jurisdiction is founded on a federal question or diversity of citizenship. Illinois Surety Co. v. John Davis Co., 244 U.S. 376, 37 S.Ct. 614, 61 L.Ed. 1206; Southern Painting Co. of Tenn. v. United States for the Use of Silver, 10 Cir., 222 F.2d 431; Wunderlich Contracting Co. v. United States ex rel. Reischel & Cottrell, 10 Cir., 240 F.2d 201, 206. The law of the State of Colorado where both contracts in this litigation were executed and were to be performed requires that, absent specific statutory authorization to the contrary, unliquidated damages bear interest from the date of entry of the judgment, not from the date of commencement of the suit. Hendrie v. Board of County Commissioners, 153 Colo. 432, 387 P.2d 266.

The District Court entered its original judgment on the verdicts on November 13, 1964 assessing six per cent interest from the date Tecon filed its counterclaim. On February 2, 1965, the Court issued its order and entered an amended judgment on the verdicts modifying the original verdict to make Rocky Mountain and Hartford jointly liable in the net amount of $177,116, with inter-

**2.** This statement should be qualified to the extent that there were rather onerous conditions in Tecon's assurance that

Rocky Mountain would be allowed to finish the contract.

est still to run from the date of the counterclaim. On February 12, 1965, Hartford filed a motion to amend the amended judgment calling the Court's attention to the fact that inasmuch as Tecon's claim for costs of completion was unliquidated even at the time of the trial, interest could be assessed only from the date of the jury's verdicts and the original judgment thereon. This motion was granted. Tecon complains that Hartford's failure to assert this error within ten days after entry of the original judgment bars relief, citing Fed. R.Civ.P. 59(b); Gray v. Dukedom Bank, 6 Cir., 216 F.2d 108; Home Indemnity Co. of New York v. O'Brien, 6 Cir., 112 F.2d 387; Stowers v. United States, N.D. Ga., 191 F.Supp. 795. None of these cases, however, involves correction of a palpably erroneous award as existed in this case. Assuming that Hartford's motion was not a timely one under Rule 59(b), there still were grounds for relief under Rule 60(b) which provides in pertinent part:

"On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; * * * or (6) any other reason justifying relief from the judgment."

See Laguna Royalty Co. v. Marsh, 5 Cir., 350 F.2d 817, 823, and authorities cited therein.

▆▆▆▆ Hartford, as surety for Rocky Mountain, urges as error in the judgments below several separate matters peculiar to it. It first asserts the existence of the right to rescind the contract of suretyship as a matter of law because Tecon as obligee failed to disclose material facts affecting Hartford's risk as surety, and also that the court erred in its instructions when submitting the matter as a factual issue to the jury. We can find no merit to the contention that Hartford was entitled to a directed verdict. The evidence clearly establishes a factual issue as to what knowledge Hartford had or did not have relating to the Tecon-Rocky Mountain relationship and to what extent, if any, such knowledge was considered material to the risk. Hartford's consideration of the issuance of the second bond can only be viewed in the light of its already existent bond on the Dearborn-Rocky Mountain subcontract. The burden was upon Hartford to prove the non-disclosure of facts by Tecon, such facts being unknown to Hartford and material to the surety risk that had led Hartford to enter into a contract they otherwise would have rejected. The evidence created a jury question that was submitted for determination on each aspect: disclosure, reliance, and materiality in determining the contract risk. In submitting the issue, the trial court instructed, in part, as follows:

"Now, normally, when a person is placed in juxtaposition to another, and misstatements of fact are made by it which induce the execution of a contract, the person deceived may, upon learning the truth, avoid the contract, because there is no meeting of the minds, no agreement as to the terms or inducement is brought about by false statements. The necessary elements are these: One, misstatement of fact of a material fact, or omission to speak when there exists a duty to speak. Secondly, the state of mind, either an intent to deceive must be present, or there must be a negligent withholding of information. That is, where it is reasonably foreseeable that the other party will be deceived unless you do speak up. Thirdly, there must be reliance by the other party on the truth of the statements made, or on the belief that there are no other facts. Fourthly, there must be a change of position, in this case the execution of the contract."

▆▆▆▆ Hartford contends the instruction is erroneous because it limits the right of a surety to rescind to cases involving willful misrepresentation or negligent withholding of information. And we would agree that the instruction

would not be proper if claims were made that Tecon had innocently and in good faith misled Hartford to the latter's detriment. A false representation can premise the right to rescission irrespective of the good faith of the representor. American Bonding & Trust Co. of Baltimore v. Burke, 36 Colo. 49, 85 P. 692. See also Nichoalds v. McGlothlin, 10 Cir., 330 F.2d 454. But such is not this case, for no specific, active misrepresentation by Tecon is claimed; rather, Tecon is asserted to have not made a full disclosure of Rocky Mountain's performance rating, an issue of omission in light of a duty to disclose. The court's instruction adequately covered this issue.

Finally, Hartford asserts that the trial court unlawfully increased the jury verdict by means of an unlawful additur. The verdict of the jury against Rocky Mountain was $225,000, reduced by the court in final judgment to $177,-116, for reasons we have discussed. Notwithstanding a specific instruction that Hartford, if liable at all, would be jointly liable in amount with its obligee, the jury found such amount to be $150,000. The trial court entered final judgment against Hartford for $177,116. This was not error. Once the jury determined Hartford's liability its function was exhausted for the amount of liability was established by law. The action of the District Court in adjusting the judgment to conform with the net verdict against Rocky Mountain was both necessary and proper. See Dextone Co. v. Building Trades Counsel of Westchester Co., 2 Cir., 60 F.2d 47; 6 Moore, Federal Practice ¶ 59.08[4] at 3804–05. This is not the situation of Dimick v. Schiedt, 293 U.S. 474, 55 S.Ct. 296, 79 L.Ed. 603, as suggested by Hartford, where the trial court, being dissatisfied with the jury's verdict on an unliquidated claim, threatened to grant plaintiff's motion for new trial unless defendant consented to an additur.

One final matter must be noted. The judgments as they are now entered are against Hartford in the sum of $177,116, against Rocky Mountain in the sum of $225,000, and in favor of Rocky Mountain in the sum of $47,884. Since the liability of Hartford as surety and Rocky Mountain as principal should be identical the verdicts for and against Rocky Mountain should reflect in a single net judgment of $177,116. Other matters suggested by the parties need not be discussed and the case is accordingly remanded to the district court with directions to amend the entry of judgments as indicated. The case in all other aspects is

Affirmed.