**AIKEN COUNTY and Aiken County Public Service Authority, Plaintiffs,**

v.

**BSP DIVISION OF ENVIROTECH CORPORATION; Insurance Company of North America; and Envirotech Corporation, Defendants-Third Party Plaintiffs,**

v.

**BAY–CON GENERAL, INC.; Davis & Floyd, Inc.,[1] and The Travelers Indemnity Company, Third-Party Defendants.**

Civ. A. No. 81–202–8.

United States District Court,
D. South Carolina,
Aiken Division.

Nov. 24, 1986.

---

1. The court has been informed that, prior to the institution of this litigation, Davis & Floyd Engineers, Inc. changed its name to Davis & Floyd, Inc. References to the former corporate name in the pleadings and motions on file are, thus, erroneous.

Donald A. Harper, T.S. Stern, Jr., Haynsworth, Marion, McKay & Guerard, Greenville, S.C., for plaintiff.

Paul W. Killian, Susan Smith Blakely, Watt, Tieder, Killian & Hoffar, Vienna, Va., Joseph O. Rogers, Jr., Rogers, Riggs & Rogers, Manning, S.C., for defendants-third party plaintiffs.

Patrick A. Thompson, S. Gregory Joy, Atlanta, Ga., Julian B. Salley, Jr., Aiken, S.C., for third-party defendants, Bay-Con Gen., Inc. and The Travelers Indem. Co.

Charles Porter, McNair Law Firm, P.A., Columbia, S.C., Thomas Pope, Joseph W. Hudgens, Newberry, S.C., for third-party defendant Davis & Floyd Engineers, Inc.

**2.** Aiken County originally brought the action, and the Authority was added as a party plaintiff by consent order dated November 9, 1981.

## ORDER

BLATT, Chief Judge.

## I. INTRODUCTION

This is an action by the plaintiffs, Aiken County and Aiken County Public Service Authority (hereinafter collectively referred to as "Aiken County"),[2] to recover damages arising out of the construction of the Horse Creek Pollution Control Facility (the "project"), located near Aiken, South Carolina. Both plaintiffs are political subdivisions of the State of South Carolina with the capacities to sue and be sued.

Envirotech Corporation ("Envirotech")[3] and Insurance Company of North America ("INA") are corporations organized and existing under the laws of a state other than South Carolina and during the contract period were authorized to, and were doing, business in South Carolina. Bay-Con General, Inc., ("Bay-Con") and Travelers Indemnity Company, ("Travelers") are corporations created and existing under the laws of a state other than South Carolina and during the contract period were authorized to, and were doing, business in South Carolina. Davis and Floyd, Inc. ("Davis & Floyd") is a South Carolina corporation.

The original dispute between the parties began with an arbitration proceeding between Aiken County and Bay-Con. On January 23, 1981, Aiken County commenced this action against Envirotech and its surety, INA, alleging breach of warranty, breach of contract, and fraud in supplying equipment for the heat treatment and dissolved air flotation ("DAF") systems of the project. Envirotech brought in Bay-Con, Travelers and Davis & Floyd as third-party defendants, and all parties filed counterclaims and cross-claims. On November 5, 1981, with the consent of all parties, the arbitration proceeding was abandoned and all claims were submitted to this court for trial non-jury. As discussed later, this order is limited to Aiken County's claims regarding the heat treatment equipment

**3.** The original complaint named BSP Division of Envirotech. Envirotech Corporation was added as an additional defendant by an oral order of the court on September 1, 1982.

and the related defenses and cross-actions. Specifically, I have limited these findings of fact and conclusions of law to Aiken County's third, fourth, fifth, and sixth causes of action and the defenses and cross-actions related thereto.

These allegations can be summarized as follows: Aiken County's causes of action against Envirotech alleging breach of warranty, breach of contract, fraud, and liability of INA as surety; Aiken County's causes of action against Bay-Con alleging breach of warranty, breach of contract, negligence, and liability of Travelers as surety; and Aiken County's cause of action against Davis & Floyd alleging breach of contract. In addition, Bay-Con, Davis & Floyd and Envirotech each asserted claims for indemnification, including attorneys' fees, against the other.

The trial commenced on September 1, 1982. After several weeks of trial, it was agreed by all parties and the court that Envirotech should clean and inspect the heat treatment equipment and that, thereafter, Aiken County and Davis & Floyd would test it. This effort began in January, 1983, and continued until June, 1983. The trial recommenced in January, 1984, at which time, on motion of Aiken County and Davis & Floyd, the court decided, that the most efficient way to dispose of this case was to bifurcate the issues and try first Aiken County's claims with regard to the heat treatment equipment, and the related defenses and cross-actions. The trial on the heat treatment issue was concluded on December 11, 1984.

This case involved the most extensive discovery and the longest trial that this Court encountered in fifteen (15) years on the trial bench. There were thirty-eight people deposed over a total of seventy-four days. The documents produced by all parties could only be counted by the box. The trial consumed fifty-two days, exclusive of many motion days, during which twenty-one witnesses testified, and the transcript includes approximately 6,690 pages.

## II. MOTIONS

### A. Bifurcation and Rule 54(b) Certification

■ Under the authority granted by Rule 42(b), the Federal Rules of Civil Procedure, and on motion of Aiken County and Davis & Floyd, I determined that Aiken County's heat treatment claim (hereinafter "heat exchanger claim") should be tried first. The heat exchanger claim was a separate claim in that it presented an aggregate of facts giving rise to an enforceable right. *Gottesman v. General Motors Corp.*, 401 F.2d 510, 512 (2d Cir. 1968). Moreover, it was the largest and most important issue in the case,[4] and the Court felt it would be inadvisable to dilute the court's focus on that issue by a lenghty trial of numerous unrelated defective equipment and delay claims. *Martin v. Wyeth, Inc.*, 96 F.Supp. 689, 697–98 (D.Md. 1951), aff'd 193 F.2d 58 (4th Cir.1951). These other issues were based on separate facts and would not involve relitigation of the facts in the heat exchanger claim. In addition, the Court felt that bifurcation would most likely result in savings of time and expenses to the parties and the court. *See, Value Line Fund, Inc. v. Marcus*, 161 F.Supp. 533 (S.D.N.Y.1958).

Envirotech was the only party to object when the court asked for the parties' written positions on the issue of bifurcation. The Court could see no prejudice to Envirotech in this procedure. The burden of transporting a witness back to court on the later issues is one which will be shared by the other parties. Any claim that Envirotech's witnesses might have to travel greater distances was a *de minimis* consideration given the size of this case and the number of trips made to the separate trial sessions already held. The Court also found no prejudice in separating Envirotech's heat treatment delay claim. First, the two claims were conceptually and factually distinct; second, Envirotech was al-

---

**4.** The heat exchanger claim alone involves several million dollars. On the other hand, the other claims have values of not much more than One Hundred Thousand ($100,000.00) Dollars each.

lowed to litigate all affirmative defenses found to be relevant.

■ Trial on the heat exchanger claim having concluded, Aiken County and Davis & Floyd have moved for the entry of a final judgment as to them pursuant to Rule 54(b) of the Federal Rules of Civil Procedure. In rendering a decision, the court must first find that there are multiple claims for relief and that at least one claim has been finally decided. The court must then find that, in its discretionary judgment, the equities favor a determination that no just reason for delay in entering judgment exists. *Curtiss-Wright Corporation v. General Electric Co.*, 446 U.S. 1, 100 S.Ct. 1460, 64 L.Ed.2d 1 (1980). Pursuant to Rule 54(b), I find that there are multiple claims, that the heat exchanger claim has been finally decided, and that no just reason for delay in entering judgment exists.

The parties have presented evidence concerning all issues related to the design and function of the heat treatment equipment and the responsibility therefor. Having made a decision on this claim, nothing remains for the court to do but execute the judgment. *United States v. Arkansas*, 632 F.2d 712 (8th Cir.1980).

Aiken County's claims that other equipment is defective and that completion of the plant was delayed, along with Bay-Con and Envirotech's shop drawing delay claims, are separate and independent claims. Aiken County's heat exchanger claim resolves the issues of the defectiveness of said heat exchanger, the responsibility for the alleged defects, Envirotech's knowledge of those defects, the alleged fraudulent conduct of Envirotech toward the owner and engineer, the influent issues, and all affirmative defenses of Envirotech and Bay-Con relevant to this claim. These issues are factually separate from the question of whether Davis & Floyd took excessive time to review shop drawings submitted by Envirotech and Bay-Con. If Davis & Floyd failed to return the shop drawings within an agreed time period, it may have caused Envirotech to spend more time on the job than planned, but that delay is unrelated to the issues of whether the equipment worked when installed and whether Envirotech defrauded Aiken County when it sold this equipment.

An analogous situation arose in another complicated construction case, *Hartford Accident and Indemnity Co. v. Boise Cascade Corp.*, 489 F.Supp. 855 (N.D.Ill.1980). That action involved the completion of a project by a contractor's surety after the contractor failed to perform. Upon the surety's completion, the owner refused the surety's demand for payment of the remaining contract balance, and the surety filed an action seeking recovery of the remaining contract balance. Boise, the owner, counterclaimed for losses it suffered due to the delay in completion. In deciding that the surety, Hartford, was entitled to the balance due on the project and that Rule 54(b) certification was appropriate, the court stated:

Although Boise's counterclaim arises from the same general transaction as does Hartford's claim and thus may be termed compulsory under Fed.R.Civ.P. 13(a), this in itself poses no bar to certification. *Cold Metal Process Co. v. United Engineering*, 351 U.S. 445, 452, 76 S.Ct. 904, 908, 100 L.Ed. 1311 (1956). Indeed, despite its compulsory nature, the claim and counterclaim herein raise distinct factual questions. Whereas Hartford's claim involves the question of whether it finished the project and the amount due as a result thereof, Boise's counterclaim raises the issue of when Hartford finished the project and the extent of damages suffered as a result of any delay in completion.

489 F.Supp. at 859.

The issues in Aiken County's heat exchanger claim are whether the equipment functions properly and whether Aiken County was defrauded by Envirotech in the sale of this equipment. The other claims, however, involve unrelated alleged defective equipment, alleged delay in completion of the project attributable to both contractor and supplier delays, and excessive shop drawing review time. It is clear that these claims are monetarily small in comparison

to the heat exchanger claim and sufficiently separate and distinct for Rule 54(b) certification.

The other claims and counterclaims do not prevent the certification of a claim under Rule 54 because of a possible set-off of damages. In *Curtiss-Wright, supra,* the Supreme Court noted that "counterclaims, whether compulsory or permissive, present no special problems for Rule 54(b) determinations; counterclaims are not to be evaluated differently from other claims." 446 U.S. at 9, 100 S.Ct. at 1465.

The Court further finds that the equities favor the entry of a final judgment, in that no just reason for delay exists. In making this finding, the following factors are controlling:

1. The adjudicated claims are independent of the nonadjudicated claims and will not require the court of appeals to hear the same issues twice. The only remaining issues in a second appeal would be other defective equipment, delays, and the computation of the amount of attorneys' fees.

2. There will be no later issues before this court which have already been before the court of appeals.

3. No future developments at the district court level will moot the issues on appeal.

4. The sum involved here is large, when compared to the sums involved in the remaining issues, and is allegedly needed by Aiken County to replace the defective equipment in its plant. This equipment is essential to the daily operation of the plant. It is impossible for the plant not to treat incoming waste as there is no bypass mechanism; therefore, if the heat exchangers plug, the heat treatment system would be rendered inoperable, precluding sludge processing, and crippling the plant, which as noted *infra* at 1346, handles waste for a large geographic area, included in which are two cities and numerous manufacturing facilities. A final, favorable judgment will allow Aiken County to pursue collection now and to contract for replacement, rather than waiting months or years for the remaining issues in this litigation to end, during which time the cost of construction will certainly increase due to inflation.

5. While Envirotech is pursuing a delay claim based in part on the heat exchanger system, I find that this claim does not prevent entry of a final judgment. There is no claim or indication that Davis & Floyd or Aiken County would be unable to pay a judgment if one is entered.

6. Determination of this claim on appeal may moot trial of all or a greater part of the other issues by creating a greater potential for settlement. *Curtiss-Wright Corp. v. General Electric Co.,* 446 U.S. 1, 8 n. 2, 100 S.Ct. 1460, 1465 n. 2, 64 L.Ed.2d 1 (1980). One of the reasons for trying the heat treatment claim first was its size and the thought that its resolution might cause the other claims to settle.[5] This approach recognizes that an appeal will probably be necessary before any party will accept liability on such a large issue.

### B. Bay-Con's Motions for Directed Verdict

■ At the conclusion of the plaintiffs' case, and again at the conclusion of all the testimony, both Envirotech and Bay-Con moved for a directed verdict as to the plaintiffs' claims against each, respectively. As will be seen from the findings of fact and conclusions of law to follow, Envirotech's motion was denied. Regarding Bay-Con's motion, the plaintiffs failed to establish their claim of negligence against Bay-Con or Travelers; therefore, the Court granted their motion for a directed verdict on the second cause of action alleging negligence. (Tr. 5/7/84 at 54).

---

**5.** The court has recently been informally advised by Aiken County, Bay-Con, and Davis & Floyd that all issues between these three parties have been settled in principle.

At the conclusion of all the testimony, Bay-Con moved for a directed verdict on its claim for indemnification against Envirotech. The contract between Envirotech and Bay-Con (Exhibit 407), provides in part:

§ 32. Warranties and Guarantees. The Subcontractor (Envirotech) warrants to (Bay-Con) and the Owner ... that all of the Work will be of good quality, ... will be free from faults and defects, will be in conformance with the requirements of this Subcontract and of the Prime Contract, and will function as intended by the designer of the Work ...

As will be more fully discussed in the findings of fact, it was proved that Envirotech's heat treatment equipment is defective and fails to comply with the express warranties in the specifications. There was no proof that Bay-Con acted negligently in connection with the design, manufacture, installation or operation of this equipment. Therefore, Bay-Con is entitled to indemnification from and against Envirotech for any damages for which it is responsible arising out of this action.

In the case of *Stuck v. Pioneer Logging Machinery, Inc.*, 279 S.C. 22, 301 S.E.2d 552 (1983), the South Carolina Supreme Court held:

According to equitable principles, a right of indemnity exists whenever the relation between the parties is such that either in law or in equity there is an obligation on one party to indemnify the other, as where one person is exposed to liability by the wrongful act of another in which he does not join.

This rule is also thoroughly discussed in 41 Am.Jur.2d *Indemnity* § 2 (1968) and 42 C.J.S. *Indemnity* § 21 (1944). *See also, Addy v. Bolton*, 257 S.C. 28, 183 S.E.2d 708 (1971).

## III. FINDINGS OF FACT

I find the following facts were proved by the greater weight or preponderance of the evidence.

In 1970, the Environmental Protection Agency ("EPA") identified Horse Creek Valley as one of the most polluted areas in the United States. The creek was virtually an open sewer for two cities and two large textile industries. EPA undertook to provide grants to clean up Horse Creek Valley, as well as many other sites. The congressional scheme was to provide grants for capital improvements, but not for maintenance and operation. The acknowledged purpose and effect of this approach was to encourage publicly owned sewerage treatment works to acquire the best available treatment plants and equipment and to minimize operation and maintenance costs.

Davis & Floyd published an engineering report, which presented its study of the Horse Creek Valley problem, and proposed a regional wastewater treatment plant that would treat all of the area's waste. (Exhibit 8034). The project was intended to treat the effluent from four major customers: (1) the City of Aiken, (2) the City of North Augusta, (3) Graniteville Company, and (4) United Merchants and Manufacturing Company. It was projected that about half of the waste would be domestic and half industrial, and that the load would vary depending on seasons, economic fluctuations, plant closings, changes in demography over time, and various other factors. The capacity of the project was to be an average 20 million gallons per day in the year 1995.

The project can best be described as a sophisticated wastewater treatment facility, comprising several major process equipment systems. It was designed to treat industrial and domestic waste (Tr. 9/3/82 at 403). Although the scope of this part of the trial, as heretofore explained in Section II–A, is limited to the heat treatment system, a description of the entire process is necessary.

The purpose of the plant is to remove solids from the wastewater and dispose of them in landfills, or old strip mines. Solids are removed by settling or floating them out of the wastewater. The wastewater enters the plant through a bar screen with 2–inch grids to catch large debris. It is then raised by large pumps from a wet-well so that it can flow by gravity through the plant. It next passes through a smaller bar screen and grit chamber, which removes additional debris and sand. From

there is goes to one of four (4) primary clarifiers where the primary (thicker) sludge is separated and pumped to the day (holding) tanks adjacent to the heat treatment facility. The remaining waste is aerated in one or more of the five (5) large basins, so that the bacteria will digest the solids and make them more amenable to settling or floating. The aerated material is then pumped to one of four (4) secondary clarifiers, which separates the clean water and sends this water on to the Savannah River. A portion of the secondary waste (the waste activated sludge -WAS) is pumped to the DAF equipment, which concentrates the waste again by flotation and settlement. This concentrated waste is mixed with the primary waste in the day tank, and, the mixed primary and WAS (hereafter referred to as "sludge")[6] is pumped into the heat treatment unit through a grinder. In the heat treatment unit it flows through the inner pipe of the heat exchanger into a reactor where it is broken down and sterilized by heat and pressure. It then passes through the outer shell (called the "annular space" or annulus") of the heat exchanger and into decant tanks where it is further concentrated.

The process of treating the sludge with heat is designed to allow the sludge to be dewatered more easily and to sterilize it. As sludge passes through the heat exchanger, heat is exchanged from the hot sludge leaving the reactor to the cold sludge coming to the reactor. Each vertical loop of the heat exchanger stands 4 feet high and consists of a pipe within a pipe. The inner pipe is approximately 2½ inches in diameter and the outer pipe is approximately 4 inches in diameter. The annular space is ⅝ inch across. (Tr. 1/25/84 at 484). The inner pipe is supported inside the outer pipe by small, curved metal spacers. (See Model, Exhibit 5070). There are 216 spacers in the system. (Tr. 1/26/84 at 521).[7] At the bottom of each loop the outer pipe has a cross-over connection to the next loop. The inner pipe is not in this cross-over as it continues and makes a loop at

the bottom (Exhibit 5069). Thus, the heat exchanger is simply a series of concentric tubes within tubes in which the sludge flows to and from the reactor. The sole purpose of the heat exchanger is to make the process more efficient and, therefore, more economical by transferring heat from the hot sludge to the cold sludge. (Tr. 7/9/84 at 136).

From the decant tanks, the sludge is vacuum filtered to remove the water, which comprises more than 90% of the sludge, and the solid residue is hauled off to a landfill. The process is designed to allow clean water to be discharged to the river and solid waste to be hauled to a landfill. The remaining liquid circulates through the plant.

Aiken County engaged Davis & Floyd to design a process which would treat the incoming waste. They also engaged Davis & Floyd to prepare plans and specifications, to review the bids, to perform onsite inspections, and to certify the equipment as complying with the plans and specifications.

The project was publicly advertised and the low bid was received from Bay-Con on December 22, 1976. On April 6, 1977, Aiken County entered into a construction contract with Bay-Con for the lump sum of Nineteen Million Nine Hundred Ninety-Six Thousand and No/100 ($19,996,000.00) Dollars. (Exhibit 54). As a condition of its contract, Bay-Con provided Aiken County with a performance bond from Travelers to guarantee that the work would comply with the contract plans and specifications. (Exhibit 4101). Bay-Con commenced construction in May 1977, and the plant began receiving waste on November 19, 1979.

Envirotech entered into a contract with Bay-Con to design and supply the following equipment: the primary clarifier mechanisms, the secondary clarifier mechanisms, the DAF mechanisms, the day and decant tank mechanisms, the vacuum filters, and all of the heat treatment equipment, including pumps, grinders, heat exchanger, reac-

---

6. "Sludge" is the result of the solids collection process in a waste treatment plant.

7. As to the purpose of spacers, see note 9 *infra*.

tor, boilers, piping, controls, and many other smaller items. Bay-Con's contract with Envirotech dated March 31, 1977, was for $2,801,560.00 It specifically required Envirotech to comply with the contract plans and specifications. (Exhibit 407). The heat treatment specifications required suppliers to demonstrate experience with the equipment or, in the alternative, to provide Aiken County a performance bond in lieu of experience. Envirotech provided a bond from INA for $2,070,399.00 to guarantee the replacement of the heat treatment equipment in lieu of demonstrating its experience. (Exhibit 5041).

Envirotech was sold in 1982 to Baker International Corporation and is a wholly-owned subsidiary of Baker. It was clear from its financial reports that Baker purchased all the stock in Envirotech and consolidated Envirotech into its operation both functionally and financially. This was not disputed by Envirotech. (Exhibits 5084, 5085; and colloquy Tr. 5/1/84 at 263–68).

In the 1970s, Envirotech was a major manufacturer and supplier of waste treatment equipment. One of its principal products was heat treatment equipment. During this period there was only two major manufacturers of heat treatment equipment, Envirotech and Zimpro. These two companies were vigorous competitors, each having a guarded and proprietary process.

The Zimpro heat exchange process involves passing sludge through the inner tube into a reactor and then out through the annulus. At some point, air is injected which causes oxidation. The air also causes significant turbulence within the piping. This process is referred to as wet air oxidation; the exchange of heat was direct from the hot sludge to the cold sludge. (Exhibit 3016(B)).

Envirotech installed its first heat treatment unit in the United States in the late 1960s with an installation at Colorado Springs, Colorado. (Exhibit 5073 at 73). This heat exchanger employed a similar design to the Zimpro, except that air injection was prohibited as it was a patented process. (Tr. 1/26/84 at 513). This equipment failed. Envirotech described the failure as follows:

> Not long after the process operation began, the heat exchanger plugged on the raw sludge side ... The heat exchanger is essentially a pipe within a pipe design....
>
> When the heat exchanger was cleaned, it was found that short pieces of ground synthetic materials had formed large balls inside the pipe annulus clogging the flow.

(Exhibit 5016).

In addition to its own experience at Colorado Springs, Envirotech received similar reports of plugging from plants in Europe and the United Kingdom (Exhibit 8026).[8]

Envirotech replaced the Colorado Springs equipment with a sludge to water design. (Tr. 1/25/84 at 450). This design had water in the outer tube as the heat transfer medium instead of sludge, and thus the heat transfer was indirect. This modification was 100% effective in eliminating plugging or clogging in the outer tube.[9] Thereafter, Envirotech marketed only this design and supplied approximately 29 of these sludge to water systems between its development of the system at Colorado Springs in late 1969 and its design of the Aiken County system in 1977. (Exhibit 5080).

8. Envirotech obtained a license for this process in the United States which it began in 1967 at Colorado Springs. However, as noted in these reports of overseas operations, the original heat exchanger design was changed to a sludge to water configuration because of plugging problems.

9. The reason that the outer tube is susceptible to plugging problems is that it must have a series of spacers between the outer wall of the inner tube and the inner wall of the outer tube to maintain the design space due to the operating pressures of the system. Without these spacers the walls could collapse. As noted earlier, this space is referred to as the annular space. (See Model, Exhibit 5070). Materials in the sludge can hang up on the spacers. With the change to sludge to water, there was no possibility of plugging because water flowed around the spacers, not sludge. The configuration of these spacers is important because of their potential to cause clogging.

During the planning for the Aiken County project, Davis & Floyd had many contacts with Envirotech through its sales agent, the Taulman Company. In 1972, Taulman requested that samples of the wastewater be sent to Envirotech for analysis. (Exhibit 1002). Davis & Floyd secured composite samples from the textile industries and municipalities and sent them to Envirotech. (Exhibit 8036). Envirotech, through Taulman, later provided its analysis. (Exhibit 8037). In 1974, the Taulman Company sent Davis & Floyd Envirotech's sales literature, which stated that Envirotech's heat treatment equipment was sludge to water. (Exhibit 1005). In 1975, Taulman sent Davis & Floyd sample design drawings showing a sludge to water system—its "standard system." (Exhibits 6021 and 3010). Taulman's personnel became familar with the industries which would discharge waste to the project. (Exhibit 6026). As late as May, 1976, Envirotech proposed a heat treatment system with a sludge to water heat exchanger and sent to Davis & Floyd a set of suggested specifications for such a system. (Exhibit 8018).

In the fall of 1976, Davis & Floyd issued its plans and specifications for the project. (Exhibit 5019). The heat treatment section (15S) provided for the Zimpro wet air-oxidation system and, as an alternate, the Envirotech system with a sludge to water heat exchanger. (Exhibit 421). On November 23, 1976, Taulman met with Davis & Floyd and requested that an addendum be added to the specifications which would allow a spiral heat exchanger. (Exhibit 5073 at 92). Davis & Floyd did not agree to this suggestion and did not alter its specifications, but Davis & Floyd did require a supplier, not having experience with a particular piece of equipment, to post a replacement bond. (Exhibits 6035 and 1023).

Taulman's representative testified that on the day of bidding, Envirotech again changed its position and bid a sludge to sludge, tube-in-tube heat exchanger. (Tr. 7/11/84 at 479; 7/12/84 at 586–87). This was the first time a sludge to sludge heat exchanger was suggested by Envirotech since its failure in Colorado Springs in 1969. (Tr. 2/2/84 at 903.)

Envirotech bid a system with a sludge to sludge heat exchanger because its sludge to water heat exchanger was at a competitive price disadvantage to the Zimpro process. Envirotech's project manager, Frank Breedlove, testified: "In the sludge to water heat exchanger, it takes approximately twice the number of tubes as sludge to sludge." (Tr. 1/25/84 at 475–76). Envirotech's bid was a part of a plan designed to secure the contract but to leave Envirotech's options open to select one of three types of heat exchangers after they had secured the contract. (Exhibit 3002; Tr. 1/25/85 at 463).[10]

Although it was more price competitive, Envirotech's engineers saw many problems with the design and operation of a sludge to sludge heat exchanger. On June 24, 1977, Gene Pecci, Envirotech's project engineer for the Horse Creek project, identified "serious expensive problems" with a sludge to sludge design saying "No way on primary sludge—published data says plugging evident" and that Envirotech "should use contingency money and convert to sludge to water." (Exhibit 413). This was not the first time Envirotech recognized this problem. Prior to bidding, Mr. Pecci's predecessor, Jay Johnson, wrote a memo listing five problems with the sludge to sludge system, including "plugging" and "solvent cleaning." (Exhibit 3001).[11]

Envirotech met with Davis & Floyd on June 29, 1977, and advised that they were

---

**10.** As noted in its internal "proposed plan", Envirotech intended to put together the "lowest cost bid" but "[t]his does not say we'll provide the system he has specified in the documents received on 11/12/76 ... [Y]ou've got no leverage unless you're the low bidder so our best approach was to follow the intent of the specifications with respect to function and capacity but to 'disregard' the mechanical detail specifications." (Exhibit 3002). This concept carried

through to the sale representative, Bill White, who wrote: "... lets [sic] go with spiral heat exchangers if cheaper—lets go with cheapest—(sludge to sludge if needed)." (Exhibit 8019).

**11.** Also noted as an area of concern was the ominous phrase "Remember Colorado Springs No. 1?"

considering three designs for the heat treatment: (1) the sludge to water as originally proposed and as called for in the specifications; (2) the spiral; and (3) the sludge to sludge. (Exhibit 4012). Mr. Pecci's memo of this meeting expressed concern over the effect of textile waste on the sludge to sludge system (Exhibit 414).

After testing, the spiral heat exchanger was determined to be unsatisfactory. (Exhibit 417). The internal discussion was then between sludge to water and sludge to sludge. The evidence revealed a divergence of opinion within Envirotech management personnel. The sludge to water proponents included the project manager, Frank Breedlove, and Envirotech's engineering department. They concluded in a memo dated July 8, 1977, that the decision on the heat exchanger "must be based on solid engineering principles, substantiated by test data, where possible." (Exhibit 415). The sludge to sludge proponents were led by Envirotech's president, Paul Castenholtz.

On July 22, 1977, Envirotech's engineering department issued a report calling for a sludge to water heat exchanger for Aiken County, saying this was the only reliable heat exchanger with "100% confidence factor (no plugging)." (Exhibit 420). They also reported that the metal spacers would catch fibers and cause plugging.[12]

On July 26, 1977, a meeting was held by Castenholtz, the engineers, and Breedlove to review the engineering report and decide which heat exchanger to provide. At that meeting Paul Castenholtz made the decision to overrule his engineers and Breedlove and to provide Aiken County with a sludge to sludge system. (Exhibit 426).[13] This decision was made solely for financial gain and was in total disregard of sound engineering principles.[14]

Two days later, on July 28, 1977, Envirotech met with Davis & Floyd to advise of its decision to use sludge to sludge. At this meeting, Envirotech got a copy of the Davis & Floyd pilot plant study. (Exhibit 6385). Although Envirotech contended at trial that its decision to supply sludge to sludge was based upon the pilot plant study, I find that this was not the case, since the decision to provide a sludge to sludge heat exchanger had already been made at the meeting on July 26, 1977,[15] two days before receipt of this study.

Furthermore, there is no credible evidence that upon receipt of the pilot plant

---

12. See note 9, supra.

13. Mr. Pecci admitted during cross-examination that he had testified at his deposition as follows:
Q. In truth and in fact, Mr. Pecci, what happened was the President of your company made the decision from an economic standpoint, that they were going to go against the recommendations of your engineering department, and provide a sludge to sludge heat exchanger; is that not correct:
A. I'm not really sure who made the final decision. It was decided at a level highter than I was.
Q. Who was the head of the company when you were there in the fall of 1977?
A. Paul Castenholtz.
Q. And you don't know who made the decision.
A. From memos, I assume he did.
Q. You also assume that was for an economic reason?
A. Yes.
Q. Because that's cheaper?
A. Yes, there was less heat exchanged in the sludge to sludge.
Q. And you think it was an engineering decision?

A. I don't think it was an engineering decision.
(Tr. 10/29/84 at 172–173).

14. Mr. Breedlove testified with respect to this meeting and the reasons for Mr. Castenholtz's decision:
Q. Why did he make that decision, Mr. Breedlove?
A. It was his decision to make that decision.
Q. You were there, you heard—What did he tell you? What was his response?
A. My interpretation was it was for economic reasons.
Q. Yes, sir. You would make more money if you went sludge to sludge than sludge to water, and what was your response?
A. That is right.
(Tr. 2/6/84 at 1017–18).

15. Mr. Pecci described the meeting as follows: "In that meeting, engineering voiced their recommendations, marketing voiced their concerns, and a *decision was made* to supply sludge to sludge heat exchanger at Aiken County." (Tr. 7/26/84 at 44 (emphasis added); See also Tr. 10/30/84 at 225–26).

study, Envirotech's concerns in supplying a sludge to sludge heat exchanger were eliminated by information contained in that study. Mr. Pecci, who testified to this effect, conceded that there was no documentation in support of his contention. (Tr. 10/30/84 at 224–25). I find this testimony not to be credible and reflective of Envirotech's corporate attitude. This contention is belied by their subsequent internal actions.

Envirotech also reported to Davis & Floyd on July 28, 1977, "that test work was still in process on spacer designs to minimize the possibility of plugging in the annulus." (Exhibit 6385).[16] Envirotech originally selected seven possible spacer designs. A testing program was outlined in March, 1977. (Exhibit 4046). Tests were run in August or September, 1977. Three of the proposed spacers were tested. The test report concluded each failed due to plugging. (Exhibit 431).[17] The spacer design installed in the heat exchanger in Aiken County was never tested. (Tr. 1/25/84 at 504).

Faced with management's decision to supply a sludge to sludge heat exchanger, Envirotech's engineers demanded testing which would address their previously expressed fears. The following chronology demonstrates the importance which Envirotech's engineers felt spacer tests had to the successful design of the equipment.

(1) The engineering report dated July 22, 1977 says: "There is insufficient data to prove what design eliminates, let alone minimizes, the hang up on spacers." (Exhibit 420 at 4)

(2) Mr. Breedlove's memo dated August 3, 1977, quotes Castenholtz as instructing: "Engineering proceed immediately to develop and test an acceptable spacer design." (Exhibit 426).

(3) Another Breedlove memo of August 3, 1977 states: *"Action Recommended:* (2) Engineering to complete design and test of non-clog spacers as soon as possible but not later than November 1, 1977." (Exhibit 425).

(4) Mr. Pecci's memo of September 22, 1977, states: "I am certain that everyone involved feels that testing is the only sure way of determining the best design...." (Exhibit 429).

(5) Mr. Breedlove's memo of September 26, 1977, states: "Testing of spacer designs for the sludge configuration *must* be implemented before this unit is installed.... I believe it is *mandatory* that tests be performed at the earliest possible date on Engineering's proposed spacer designs. (Exhibit 430, emphasis added).

(6) Mr. Chernicky's memo dated September 29, 1977, concerning the design parameters for Aiken County's heat exchanger states: "The sludge may contain solids up to ½" size plus fibrous and stringy material. Therefore the exchanger must be designed to prevent hangup and resultant plugging by this material." (Exhibit 432).

(7) Engineering's department memo dated September 29, 1977, states: "We must keep in mind that short fibers, which reassociate into long fibers, will have a tendency to wrap around the best spacer design." (Exhibit 431).

(8) Mr. Breedlove's memo of October 3, 1977, states: "Today engineering advised there was not funding, manpower nor time available to accomplish the recommended test.... In

---

**16.** Mr. Pecci testified regarding Envirotech's communications with Davis & Floyd regarding the testing of spacers as follows:

Q. Mr. Pecci, ... did you tell Davis & Floyd that you were doing tests on the spacers for Aiken County?
A. Yes, that's what this says (referring to Exhibit 6385).
Q. And, in fact, you never did any tests on the spacers for Aiken County?
A. No, we did not.
Q. And did you ever tell Davis & Floyd that you did not do what you represented on July 28th that you were doing?
A. No, we did not.
(Tr. 10/30/84 at 277).

**17.** This test report with its results was never provided to Davis & Floyd. (Tr. 11/13/84 at 681).

light of our exposure, I feel it is *mandatory* that the spacer selections be tested before installation, if not before completion of fabrication of the heat exchangers." (Exhibit 433, emphasis added).

Despite this apparent engineering commitment to testing, management disregarded these recommendations and proceeded with the design without testing the spacers for Aiken County. This was apparent in Pecci's memo of October 24, 1977, in which he states: "[I]n a meeting attended by P. Castenholtz, ... it was decided that there will be no heat exchanger spacer design testing for Aiken, S.C." (Exhibit 436).[18]

Another concern of Envirotech during the design period was the method of cleaning this heat exchanger. The specifications called for all stainless steel tubes, which could be cleaned with nitric acid. Envirotech's engineers acknowledged that "[h]ot nitric will do a better job than inhibited HCL." (Exhibit 400 at 1).

Envirotech's standard sludge to water heat exchanger is made of carbon steel tubes, which cannot be cleaned with nitric acid. (Exhibit 400 at 1). However, with their standard system, cleaning of the outer tube, or annulus, of the heat exchanger is virtually unnecessary since there is only water in this space. The inner tube is effectively cleaned mechanically with a bullet-like device with bristles called a "poly-pig" which is possible to use since there are no obstructions in this space.

Members of Envirotech's engineering department argued repeatedly that stainless steel piping and nitric acid cleaning should be used and, later, that the effectiveness of the hydrochloric acid ("HCL") cleaning selected in lieu of nitric acid should be tested, as demonstrated by the following:

(1) Jay Johnson's memo of November 15, 1976, states:

Zimpro—Zimpro has had years upon years of experience with sludge to sludge units, yet they have not attempted to reduce costs by using carbon steel in the cooler section. Why do they continuously rely on solvent cleaning alone, when the poly pig is available to them for cleaning the inner tube, where their highest concentration of scaling undoubtedly occurs? Is it not possible 180°F nitric acid is used to reduce build up in the annulus, as well as scaling of the inner tube? (Exhibit 3001).

(2) The engineering report of July 22, 1977, which recommended that sludge to sludge not be used in Aiken County, noted that Zimpro has used nitric acid to clean its stainless steel heat exchangers, but that it cannot be used at Horse Creek unless the material is changed to stainless steel. (Exhibit 420).

(3) Mr. Hannah, who authored the July 22, 1977 report (Exhibit 420), reported on September 29, 1977, that the effectiveness of inhibited HCL, chosen for Aiken's heat exchanger because it is made of carbon steel, should be tested "to determine whether [it] will dissolve and remove the inorganic materials that cause plug-ups in the annulus of a heat exchanger." (Exhibit 431).

(4) Mr. Breedlove's memo of October 3, 1977, states: "... [T]he effectiveness of inhibited HCL in removing scale and *fibrous plugging* should be demonstrated before the Aiken exchangers are installed." (Exhibit 433, emphasis added).

As with the spacers, no inhibited HCL tests were performed. In Mr. Breedlove's letter of February 24, 1978, sent to Davis & Floyd and Bay-Con as justification for change order number 5, he justified the use of HCL acid in lieu of the specified nitric

---

**18.** Mr. Dodge, the head of the team which bid the job for Envirotech, testified that spacer design was a very significant fact in the design of the sludge to sludge heat exchanger. (Exhibit 5073 at 138).

It is also important to note that the memos quoted in paragraphs 2–8 all were generated by

persons with knowledge of the pilot plant study, and were generated after receipt of the study, yet none support Envirotech's contention that this study alleviated Envirotech's concerns with the installation of a sludge to sludge heat exchanger.

acid as follows: "BSP's *practice* is to use an inhibited hydrochloric acid solution and our *experience* has been that this system does a satisfactory job of cleaning the exchanger." (Exhibit 5081, emphasis added). Upon questioning by the court, Mr. Breedlove stated that the terms "practice" and "experience" were poor word choices. The record fails to indicate that they had any experience, and the court finds that Envirotech's claims of experience and testing were material misrepresentations. (Tr. 2/6/84 at 1064–68).

Envirotech failed to test the spacers or the effectiveness of HCL, despite its admitted lack of experience and its representation to Davis & Floyd. The decision was made to use carbon steel, which cannot be cleaned with nitric acid—the only method known to be effective.[19] These decisions were reached because of the desire to save money and were made knowing that they were probably unsound based on the advice of Envirotech's own engineers. The disingenuousness of these decisions is underscored by the later false claim that the Envirotech system had been tested and was engineeringly sound.

Envirotech designed the heat treatment system (Tr. 11/6/84 at 181–82); Davis & Floyd questioned the performance and reliability of the equipment. (Exhibit 8011). Davis & Floyd asked what the pressure loss across the annulus would be for a "clean" heat exchanger and for one which was "dirty". Envirotech advised Davis & Floyd that the pressure loss was not an indication as to when the heat exchanger needed cleaning. (Exhibit 5079). Envirotech stated that the criterion for cleaning was the temperature differential;[20] however, pressure loss is the primary criterion for evaluating the operation of the equipment, a fact which Envirotech concealed during design and construction, but admitted at trial. (Exhibit 5023–B).

Davis & Floyd's questions culminated in a meeting at Envirotech's offices in California in February, 1978. Emmett Davis, the president of Davis & Floyd, testified regarding the meeting and his testimony was not contradicted. He stated that at this conference Castenholtz took him aside and specifically advised him that Envirotech had tested the equipment and that, if it did not work, Envirotech would replace it.[21]

Mr. Davis testified that they would not have allowed Envirotech to install this equipment if they had known of the July 22, 1977, engineering report. (Tr. 12/10/84 at 22). Aiken County and Davis & Floyd relied upon Castenholtz's representations and approved change order number 5, which allowed Envirotech to design, manufacture, and install a sludge to sludge heat

---

19. Indeed, when used at Aiken County, HCL has not been effective. *See* note 29, *infra*.

20. The issue of what the pressure loss would be was raised by Davis & Floyd and discussed at a meeting held in Greenwood, S.C., on January 18, 1978. The specific question was "Please advise friction (head losses) across heat exchanger, both sides for clean tubes and for tubes at worst operating conditions." (Exhibit 5082). Envirotech's response was that pressure loss was not a criterion for cleaning the heat exchanger, but rather that temperature differential was. (Tr. 11/7/84 at 309; Tr. 11/13/84 at 670). Moreover, in the drawings originally submitted to Davis & Floyd for approval, there was no realistic method of determining the pressure drop on the annulus side of the heat exchanger, since Envirotech did not provide for any pressure gauges at the entrance to the heat exchanger. (Tr. 2/8/84 at 65–67). Mr. Timmons testified: "That is a standard at Davis & Floyd. Before a pump or after a pump, we require a pressure gauge." (Tr. 11/13/84 at 671).

21. Mr. Davis testified that at his meeting with Mr. Castenholtz he "wanted to express to him our concerns about the process." (Tr. 12/10/84 at 19). He described Mr. Castenholtz's response as follows:

Q. Did he respond to your concerns, Mr. Davis?
A. Yes, sir he responded very positively.... [H]e said, 'Mr. Davis, we have tested this equipment. We don't have any engineering problems.' I said, 'Mr. Castenholtz, I am delighted to hear that because we don't know what we are buying right now. We don't have enough information to really draw conclusions and it worries us.' He said, 'In addition to that, not only are we satisfied that this equipment will work, but we are also furnishing you a bond and if the equipment doesn't work, it is going to be replaced. There is no problem. It shouldn't be a concern of Davis & Floyd.'
(Tr. 12/10/84 at 20).

treatment system on the project. (Exhibit 8000).

I find that Mr. Castenholtz's statements were material, false, intended to mislead, and did, in fact, mislead Davis & Floyd. I also find that Envirotech's failure to advise Davis & Floyd of its engineering report recommending against the sludge to sludge design and against carbon steel tubing constituted fraudulent conduct.

Envirotech completed the installation of the heat treatment equipment in the summer of 1979. The plant received wastewater on November 19, 1979, but, other than testing, the heat treatment system was not operated until late 1980 due to insufficient quantities of sludge and other mechanical equipment failures. (Tr. 1/23/84 at 108; Exhibit 237). The heat treatment system's first performance test in August, 1980, failed. (Exhibit 6296A). In late 1980 and early 1981, Davis & Floyd and Aiken County observed problems with clogging, or plugging, in the annulus of the heat exchanger. (Tr. 1/23/84 at 108–115; Exhibit 8041, 8042). Restrictions of material in the sludge in the annulus of the heat exchanger cause a loss of automatic control and necessitate frequent cleaning.[22] These restrictions are reflected as a loss of pressure between the inlet and the outlet of the annulus. As the sludge leaves the reactor and enters the annulus a gauge records the pressure. As the sludge leaves the annulus another gauge records its pressure. The difference between these readings is the pressure differential—also referred to as the "delta p"—and indicates the amount of restrictions in the annulus.[23]

More than a year prior to the time Aiken County and Davis & Floyd observed this plugging problem, soon after waste was received into the plant, Envirotech recognized the equipment failure due to this plugging, which was the very problem it had anticipated during the design phase. The following chronology demonstrates its internal acknowledgment of responsibility:

(1) On January 3, 1980, Mr. Breedlove prepared an "exposure analysis" stating that the equipment might require redesign due to plugging and recommending a "most likely" exposure of $1,051,000.00. (Exhibit 8007).

(2) On January 11, 1980, Mr. Breedlove received information that resin-based fibers were coming into the plant. He recognized that this increased the probability that Envirotech "will encounter heat exchanger annulus problems." (Exhibit 8006).

(3) On January 11, 1980, Mr. Breedlove revised his "exposure analysis" to recommend a "most likely" exposure of $1,301,000.00, and a maximum exposure of $2,391,000.00. (Exhibit 8007A).[24]

(4) On March 9, 1980, Mr. Breedlove recorded in his diary that Envirotech personnel had observed pressure loss in the outer tube and that plugging was occurring. (Exhibit 400).

During training, Aiken County's operators were not told by Envirotech what the normal pressure loss would be, (Tr. 5/2/84 at 36), nor does the original operations and maintenance manual describe the consequences of such pressure loss. (Exhibit

---

**22.** Mr. Breedlove described the effect of plugging on automatic operation of the system as follows: "When the pressure differential reaches a certain limit, you cannot pump an adequate quantity through the system to maintain the level in the reactor, and it can no longer remain on automatic control." (Tr. 1/21/84 at 697).

**23.** "Pressure loss" is a term used to define the amount of pressure dissipated between two points. For example, when the sludge leaves the reactor on its way to the decant tank, it is traveling through the annular space. As it enters the annular section of the heat exchanger, after leaving the reactor, there is a pressure gauge. This gauge will usually show a high reading such as 260 psi. As it leaves the other end of the annular section of the heat exchanger, there is another pressure gauge. This gauge will show a much lower reading such as 50 psi. The difference between the pressure readings on these gauges is the "pressure loss," or, in the example, 210 psi. Among other things, restrictions cause a greater pressure loss, and thus, the pressure loss is an indication of clogging and plugging in this section of the heat exchanger.

**24.** These exposure analyses were prepared for management involved in the sale of Envirotech. (Tr. 2/2/84 at 933).

5023). In early 1981, the operational problems of the heat treatment equipment became more severe, and when the second performance test was run in April, 1981, Davis & Floyd refused to certify the equipment due to mechanical problems. (See Exhibit 5055). On April 8, 1981, Davis & Floyd requested an explanation from Envirotech for the pressure loss. (Exhibit 8001). This request was again made in July, 1981. (Exhibit 5043). The evidence showed that the equipment did not pass the performance test, that it required manual operation during this test due to plugging, (Tr. 1/31/84 at 699), and that Envirotech did not respond to Davis & Floyd's questions concerning the significance of the pressure loss (Tr. 2/1/84 at 752). Envirotech finally provided Aiken County with a revised manual for operation in October, 1983, after this trial had been underway for a year, which stated that pressure loss is the primary criterion for determining the system's performance. (Exhibit 5023–B).

I find that Envirotech anticipated plugging problems with its equipment and willfully concealed this knowledge from Davis & Floyd and Aiken County.[25]

There was considerable testimony as to which constituents in the waste caused the clogging. It was evident, and confirmed by the court's own observation of a sample introduced in evidence, that strings, fibers, sand and miscellaneous black substances were present. (See Exhibit 8039).

It was conceded by Envirotech that, if the equipment had carried water in the annular space, there would have been no restrictions in the flow.[26] The following quote from an Envirotech publication describing how it overcame similar problems at its original installation at Colorado Springs, and that plant's subsequent successful operation, is very relevant to this case:

> Initially short pieces of ground synthetic fibers and other materials were found to have reconstituted into strands or balls and blocked the annular opening between the inner and outer tubes. By essentially dividing the heat exchanger in half and adding a closed circuit with a circulating water pump, a closed circuit with a circulating water pump, a closed coupled water to sludge heat exchanger was created. This simple step effectively eliminated all blockage problems and the heat exchanger has not been dismantled for cleaning or washed with any cleaning solvents since February of 1969. The system has operated continuously, 168 hours per week, now for four years except for maintenance shutdowns. Maintenance shutdowns are scheduled for one week periods to replace valves and reline or point up boiler brick at least once a year.

(Exhibit 8029). Envirotech, however, dropped its heat treatment product line in November, 1979, and does not have the capability to make similar modifications at Aiken County. (Exhibit 2055).

A witness for Davis & Floyd testified that the velocity of the flow in the annulus at the cross-over was not sufficient to keep the solid material in suspension and that, as the sludge passes into the next "upriser," the solids drop out and cause a blockage in the outer pipe. (Tr. 2/9/84 at 99–102). This blockage was observed by Envirotech personnel in 1983.[27]

Envirotech knew that it was furnishing a heat exchanger which was inherently subject to plugging. Its failure to provide adequate velocity to prevent blockage in the cross-over pipes compounds the owner's problems.

---

**25.** As early as January-March, 1980, Envirotech knew that the heat exchanger was, in fact, having problems due to plugging. *See* discussion at 1356, *infra*. It also believed that its one year warranty for this equipment commenced on February 22, 1980; yet it waited until a few days after it believed its warranty had expired to notify Aiken County of this potential plugging problem. (Exhibit 6331).

**26.** Mr. Breedlove admitted that if Envirotech had supplied a sludge to water system to Aiken County on this project, there would be no possibility of plugging in the annular space. (Tr. 2/6/84 at 1015–16).

**27.** Henry May described his observations during cleaning: "You can see a considerble amount of material collected in the upriser, more than the down comer." (Tr. 5/11/84 at 69).

The plugging problem was aggravated by Envirotech's failure to provide an effective method to clean the annulus of the heat exchanger.[28] Envirotech did not provide a method to mechanically clean the annulus. The only methods provided were flushing with water, steam or acid. These methods have proved to be inadequate.[29] Mr. Breedlove testified that the equipment should be cleaned until the pressure differential across the annulus reaches 150 p.s.i.[30] Envirotech also sets this forth in its supplemental operations and maintenance manual (Exhibit 5023B). The operator of the Aiken County heat treatment system, Brent Midgett, testified that he had never achieved that level of cleanness. (Tr. 5/2/84 at 68).

In conclusion, I find that Envirotech supplied Aiken County a heat treatment system that was defective in that it plugged and could not be efficiently or effectively cleaned.

Further, I find that Envirotech committed the following fraudulent acts in connection with its design and supply of the heat treatment system:

(1) In furnishing a design which it knew or should have known would not meet the design specifications.

(2) In falsely representing that the heat treatment system would be and had been tested, when, in fact, it decided not to test the equipment due to cost.

(3) In falsely representing that the heat exchanger could be effectively cleaned by the use of HCL acid when, in fact, it had not tested such use and HCL is not effective.

(4) In failing to disclose that the equipment would likely plug, and in failing to disclose the methods for identifying the plugging problem when it occurred.[31]

The first three acts, which occurred before change order number five (Exhibit 8000) was approved in March, 1978, were designed to induce Aiken County and Davis & Floyd to allow the use of this system. The fourth act was intended to conceal from Aiken County and Davis & Floyd known defects in the performance of the equipment. Not only did Envirotech's acts defraud Aiken County, but such acts are the proximate cause of Aiken County's failure to receive equipment which met the required specifications.

The specifications set forth definite criteria for determining whether the equipment met acceptable performance standards. The first requirement stated: "[T]he system[ ] furnished shall be complete in all details and shall be placed in operation ready to operate continuously on a 24–hour per day basis with not more than 15 percent of total time required for maintenance and repairs." (Exhibit 421, paragraph 155.-1). There was much testimony about the meaning of this provision of the contract. I find the most reasonable interpretation of this provision to be that no more than 15% of the time the equipment actually operated should be spent on maintenance and repair.[32] Although it should be able to operate 24 hours a day, continuously, if it operates less than that, then the 15% would apply to the actual time that it operated. (Tr. 2/1/84 at 782–783). The following equation illustrates this performance parameter:

$$\frac{\text{time spent on maintenance and repairs}}{\text{total time operating on sludge.}}$$

Paragraph 15S.7.1 of the specifications requires that the equipment "be capable of being operated with all automatic and safety features functioning." Finally, Paragraph 15S.16 provides: "In the event that

28. Mr. Bibb, Aiken County's plant manager, testified: "There is not a good way to clean it." (Tr. 1/23/84 at 113).

29. Envirotech's procedure using HCL acid was performed in June, 1982, and it was not effective. (Tr. 11/2/82 at 1427, 29).

30. Mr. Breedlove testified: "If, after cleaning, you correct the pressure drop, and it's not less

than 150 p.s.i.g., that's a possibility. You haven't done an adequate job of cleaning." (Tr. 1/26/84 at 542).

31. See note 20, supra.

32. Envirotech conceded that cleaning the heat exchanger to remove plugging is maintenance. (Tr. 2/1/84 at 740).

the sludge processing system cannot be operated in a practical manner, even with corrective changes, the Owner shall have the option of having the Contractor and equipment supplier remove the entire system at no cost to the Owner or to allow further revisions and/or replacements." (Exhibit 421).

The parties introduced summary charts and testimony relating to the equipment's performance beginning in late 1980 through December, 1983. During the trial, in January-February 1983, Envirotech was allowed to clean and examine the equipment and had an opportunity to make any modifications. After spending approximately four weeks cleaning the heat exchangers, Envirotech ran the system on cold water. It never operated the system on sludge to see what the pressure differential would be on sludge. When Aiken County operated the system on sludge after this cleaning, the pressure differential was 180 p.s.i. (Tr. 11/7/84 at 379).

Following this inspection and cleaning, Davis & Floyd analyzed the performance both from on-site observations and from a review of operating data for the period February 21, 1983, through June 1, 1983. (Exhibit 8046). They concluded that the equipment operated unsatisfactorily—without all automatic and safety features—50 percent of the total time.[33] (Tr. 11/7/84 at 452).

In addition to Davis & Floyd's evaluation, the court instructed Aiken County's chief of operations, Ron Bibb, to analyze the equipment operation during the period October through December, 1983. His analysis included a run-by-run review of the total time the equipment was operated on sludge, the total time spent cleaning, and the total time for other maintenance and repairs. (Ct. Exhibit 2). His evaluation concluded that, in October, 1983, the equipment was cleaned, maintained or repaired a total of 139.25 hours, while operating on sludge only 194 hours. Using the most liberal interpretation of the performance criteria in the specifications, I find that 42 percent of the total time was spent on maintenance and repairs in October, 1983.[34] Maintenance and repairs during November, 1983, constituted 36 percent of the total time, and those during December, 1983, were 42 percent of the total time. (Tr. 2/8/84 at 1187). Further analysis of this data reveals that, for the months of October, November, and December, 1983, the non-cleaning repairs and maintenance were 17 percent, 18 percent and 9 percent, respectively, of the total hours, while cleaning maintenance amounted to 25 percent, 18 percent and 33 percent, respectively, of the total time.

I find that the heat treatment system at Aiken County requires much more than the 15 percent maximum time for repairs and maintenance; that it cannot be operated for a reasonable time with all automatic and safety features functioning; that it cannot be operated in a practical manner as contemplated by the parties and as required by the specification; and that it cannot be efficiently and effectively cleaned using the methods supplied by Envirotech.

Bay-Con and Travelers offered no evidence in defense of Aiken County's claims and relied totally on their right to indemnification from Envirotech. I find that Bay-Con, Travelers, Envirotech and INA are jointly and severally liable to Aiken County for breach of contractual warranties. I find that Bay-Con and Travelers are entitled to have indemnification over against Envirotech and INA. INA's liability is limited to the penal sum of its bond (Exhibit 5041), $2,070,399.00, plus interest from the date of this order. I find that Envirotech is liable to Aiken County for its fraudulent conduct. I do not find any liability on the part of Davis & Floyd to Aiken County, Bay-Con, Travelers, Envirotech or INA.

33. It is undisputed that the heat exchanger clogged to the point that the pumps had to be manually cut on and off in an effort to control the rising level in the reactor. Level control was specified to be an automatic feature.

34. The following equation illustrates this performance parameter:

$$\frac{\text{total time spent for maintenance and repairs}}{\text{total time operating on sludge plus total time spent for maintenance and repairs}}$$

## IV. AFFIRMATIVE DEFENSES AND CROSS–CLAIMS [35]

■ Although it is difficult to distinguish upon which affirmative defenses Envirotech and INA relied, the court finds their affirmative defenses can be consolidated into the following factual allegations upon which evidence was offered at trial: first, that Aiken County accepted the equipment; second, that the problems with the heat treatment equipment, if any, were the fault of Davis & Floyd, due to their failure to alert Envirotech to the unexpected characteristics of the incoming wastewater; third, that Aiken County failed to give timely notice as required by the bond; and, fourth, that Aiken County is limited to specified liquidated damages. The court further finds that Envirotech and INA have failed to prove these affirmative defenses by the greater weight or preponderance of the evidence.[36]

### A. *Acceptance* [37]

■ As discussed in detail above, I find that the heat treatment equipment is defective and does not meet the specifications. The overwhelming credible testimony supports a finding that it has never been accepted by Aiken County or Davis & Floyd.[38] Although Aiken County has used the equipment for approximately five (5) years, the contract specifically provides that the owner may accept the equipment for operation prior to the successful completion of the performance tests. (Exhibit 421). The performance tests have never been successfully completed. (Tr. 2/1/84 at 754).[39]

### B. *Wastewater Characteristics*

■ Davis & Floyd was employed by Aiken County to select the process and design a waste treatment plant suitable to treat the wastewater being discharged into the Savannah River by the Cities of Aiken

35. Bay-Con and Travelers offered no proof on their affirmative defenses.

36. At trial, and in their proposed findings of fact and conclusions of law, Envirotech and INA argued that the INA bond was an illegal contract and void because Davis & Floyd failed to adequately justify its requirement in writing to the EPA. 40 C.F.R. § 35.93613(c). This contention is rejected for two reasons, either of which alone justifies the court's conclusion. First, Envirotech and INA did not plead the defense of illegality, which must be set forth affirmatively, in their answer of April 1, 1981. Fed.R.Civ.P. 8(c). Second, EPA did, in fact, approve the plans and specifications, which included a specific reference to the experience bond.

37. Envirotech attempted to prove that Aiken County and Davis & Floyd could not complain about the sludge to sludge heat exchanger since Envirotech's bid submitted to Bay-Con stated its intention to supply a sludge to sludge heat exchanger. However, Envirotech believed itself able to furnish one of three types despite its bid, and a change order was ultimately signed allowing this substitution. A change order to the contract between Bay-Con and Aiken County would not have been required if this equipment had already been a part of that contract. Furthermore, the bid documents simply required a listing of subcontractors, not equipment. A bid which gratuitously lists equipment, even though potentially different from that specified, cannot be regarded as "non-responsive"—and thus capable of rejection—since the ultimate burden is

still on the contractor to meet the performance requirements of the specifications. *See, Albert Elia Building Co., Inc. v. Sioux City, Iowa,* 418 F.Supp. 176, 180 (N.D.Iowa 1976).

38. Mr. Timmons, Davis & Floyd's vice president charged with the responsibility of certifying the equipment testified as follows:
Q. All right, Has Davis & Floyd certified the heat treatment system—
A. No, we have not.
Q. —At Aiken County? Why hasn't Davis & Floyd certified the heat treatment system?
A. Well, basically, just what I have been talking about. The unit does not operate automatically. It does not operate as it was intended, and as it was designed. The maintenance time—and when I talk about maintenance time, I'm just confining that now to that time which is spent for flushing, and backflushing, poly pigging, steam cleaning—just that amount of time, exceeds the limit of fifteen percent, as allowed in the specifications.
The odor control system has not been demonstrated. The O and M manual has not been provided—or the O and M manual—and [sic] up-to-date O and M Manual has not been provided, one that the operator can use, one that is a step-by-step detailed outline of how he is to operate the heat treatment unit. (Tr. 2/8/84 at 37).

39. Mr. Timmons also testified that "They did not pass this performance test." (Tr. 2/8/84 at 33).

and North Augusta and the textile mills of United Merchants and the Graniteville Company. In performing this task, Davis & Floyd sampled the wastewater discharged by the industries and municipalities and provided a detailed description of the textile waste, plant by plant, to Envirotech, which indicated that it would be difficult to treat. (Tr. 11/5/84 at 51). The engineering report prepared by Davis & Floyd (Exhibit 6044) cited the standard textbooks regarding the characteristics, composition and treatability of textile waste. (e.g. Exhibit 8038). Davis & Floyd also did a pilot plant study and report to confirm its preliminary engineering report conclusion. (Exhibit 6047). The plant was designed to biologically degrade textile waste using extended aeration. All of this material was discussed with agents of Envirotech while the work was in progress, and final copies were furnished to them.

Davis & Floyd also talked with representatives of various equipment suppliers and visited several installations containing both Zimpro and Envirotech heat treatment systems. Based on their investigation, experience, and expertise, they specified two alternate heat treatment systems: Zimpro's air-assisted sludge to sludge and Envirotech's sludge to water. It is uncontested, and I so find, that if Envirotech had supplied its sludge to water system there would be no plugging in the annulus of the heat exchanger. (*See* note 26, *supra*).

Envirotech's defense on this issue is that the waste contains polyvinyls, acrylics, and acetates—generally described as "latex-like" substances—which it did not anticipate. There is no dispute but that the waste does contain polyvinyls, acrylics and acetates; the parties disagree as to Envirotech's knowledge, the quantities in the waste, and the effect of these substances on the equipment.

The evidence clearly establishes that Envirotech knew that textile mills were major contributors to the project. (Tr. 1/25/84 at 448). All the experts agreed that polyvinyls, acrylics, and acetates are common compounds used in the textile industry.[40] Many synthetic fibers are made from acrylics and acetates, and polyvinyls are commonly used in the sizing process at textile mills. (*See* note 40, *supra*).

Envirotech, through its local sales representative, was kept informed of Davis & Floyd's study. (Tr. 11/5/84 at 46, 67). Envirotech had experience with textile waste and studied a sample of this particular waste. (Tr. 11/5/84 at 31 and Exhibit 8035). Davis & Floyd and Envirotech observed the test work jointly. Envirotech reported that the sample contained a great deal of high molecular weight material. (Tr. 11/5/84 at 38). Such material includes the normal constituents of textile waste such as synthetic resins, sizes, polyvinyl alcohol, polyvinyl acetate, and textile dyes. In fact, the content was so high that Envi-

40. Dr. Edwin L. Barnhart testified for Aiken County as an expert on, *inter alia*, the characteristics of textile waste as follows:

[W]hen you say textile waste, you imply that those materials you listed [fibers, polyvinyl alcohol, acetates] would be present. I would be surprised if I did not find a substantial amount of size of polyvinyl alcohol, polyvinyl acetates, that are a portion of the typical textile manufacturing profile. And a plant that's typically making materials would have these in their effluent.

(Tr. 11/15/84 at 17).

Similarly, Dr. Carl Adams, Envirotech's expert testified that these substances were commonly used in the textile industry:

A. I'm aware that polyvinyl alcohol is being used in the textile industry as a substitute for some of the starch compounds, for sizing and so forth over the past ten or fifteen years.

Q. And when you wash that fabric in the textile plant, you wash off that polyvinyl alcohol, don't you.
A. That's correct.
Q. All right, sir. And then after you wash it off, it's common practice to put a finish on?
A. Yes.
Q. All right, sir. And typical finishes are acetates? You need to answer.
A. That's correct.
Q. And acrylics?
A. That's correct.
Q. All right. And, in fact, acetates and acrylics also are commonly used in the textile industry as fibers—synthetic fibers?
A. Sure, that's correct.

(Tr. 7/17/84 at 295–96).

rotech suggested that it be used for fuel. (Tr. 11/5/84 at 44 and Exhibit 8047).

Based on the credible testimony of the witnesses, I find that the quantities of polyvinyls, acrylics, and acetates found in the influent to the project, were within the expectations of the parties, (Tr. 11/15/84 at 14–18), and I find no credible proof that these quantities were unusual or more than what would normally be anticipated for this type of wastewater. In reaching this conclusion, I have particularly considered the testimony of Envirotech's expert, George Aseff, regarding the quantities that he found to exist in the wastewater.

Envirotech placed great reliance on a letter written by Aiken County's executive director, Stan Wagher, on March 5, 1981, to the industries referring to a large quantity of latex-like material found on the plant's bar screens. (Exhibit 6205). However, Envirotech could not connect this isolated instance to any problems with its equipment. This was an isolated occurrence and had no identifiable effect on the heat treatment operation. (Tr. 1/24/84 at 282–85). Finally, if this occurrence did cause a problem to the equipment, the problems were corrected when Envirotech cleaned the equipment in January, 1983. As noted above, I considered the equipment performance after January, 1983, in determining that the equipment failed to meet the specifications.

Envirotech asserted that the polyvinyls, acrylics, and acetates were the sole cause of the plugging which led to excessive cleaning time and loss of automatic control. This contention was refuted by Aiken County and Davis & Floyd personnel who observed the equipment cleaned on numerous occasions. They testified that the material removed from the equipment during cleaning was mostly string and fibers. (Tr. 5/2/84 at 400; Tr. 11/7/84 at 386–87). However, some of the tiers of pipe comprising the heat exchanger did contain the latex-like materials. (Tr. 11/7/84 at 355–60). These materials are adhesive, especially polyvinyl acetate, which is a constituent of Elmer's glue. (Tr. 7/16/84 at 137). They

would undoubtedly compound any clogging problem due to fibers. Despite the presence of the latex-like material, not all of the bundles of fibers flushed from the heat exchanger during cleaning were stuck together by these substances. (Tr. 11/7/84 at 387). Therefore, I find that both the fibers alone, and the fibers in conjunction with the latex-like material, caused the plugging of the heat exchanger.

Envirotech sales literature which was sent to Davis & Floyd contained the affirmative representation that its equipment could treat any waste regardless of the waste characteristics.[41] In addition, there is no disclaimer or warning in any of Envirotech's literature or operations manuals provided to Aiken County stating that polyvinyls, acrylics, or acetates are harmful to its equipment. (Tr. 12/1/82 at 1379). Moreover, Envirotech's published literature states that this process "is suitable for any industry disposing of organic sludge—pulp and paper mills, textile mills, breweries, dairies, tanneries and agricultural chemical producers." (Exhibit 5096). Finally, testing of the waste for equipment suitability is a responsibility any manufacturer should know and appreciate. A Zimpro representative so testified, (Exhibit 8050 at 107), and Envirotech had the capability to test for these substances at that time and should have done so. (Tr. 7/17/84 at 272–73).

The heat treatment system is the final step in the process of removing solids from the wastewater. All solids are concentrated and put through the heat exchanger. Heat treatment equipment must be capable of dealing with all of the solids. It is simply incredible for Envirotech to claim that it did not anticipate that the normal solid waste from textile plants would be present in wastewater from an area dominated by textile mills. (Tr. 11/6/84 at 102–03). It is equally incredible that it would furnish heat treatment equipment that it knew was incapable of handling solids while claiming that it could "remove up to 80% of the water in thermoplastic resins," and that it could dewater "all sludges with-

---

**41.** "Heat treatment can generally be applied to all sludges without regard to the characteristics

and constituents of the sludge." (Exhibit 1005, II–2 at 9).

out regard to the characteristics and the constituents of the sludge." (Tr. 11/6/84 at 106–107).

### C. *Notice.*

■ Envirotech and INA also allege that Aiken County failed to give timely notice under the bond. The notice requirement in INA's bond provided:

(3) That notice of failure to meet the performance requirements shall be given to the principal and surety as soon as reasonably practical after discovery thereof and within the guarantee period of this obligation, as defined below, and no suit to recover against the surety on account of the obligation herein imposed shall be sustained unless such suit is commenced within six (6) months from the expiration of this bond.

(4) The guarantee period shall be defined as that period of one (1) year following the date of acceptance of the thermal sludge conditioning system for operation by the obligee.

(Exhibit 5041).

The earliest date claimed as acceptance for operation by Envirotech is February 22, 1980. (Exhibit 6290). On January 5, 1981, Aiken County's attorney wrote Envirotech and INA that the heat treatment equipment "has failed and continues to fail to meet the performance requirements detailed in Specification Section 15S ..." (Exhibit 6329). I find this notice sufficient to comply with the bond. Suit was timely filed on January 23, 1981. The complaint contained claims that the thermal sludge conditioning system, which includes the heat exchanger, was defective and also served as notice under the bond.

### D. *Liquidated Damages.*

■ Finally, Envirotech argued that Aiken County should be limited to the $50,-000.00 established in the liquidated damages provision in Section 15S.17 of the specifications. As will be discussed more fully in section six of this order relating to damages, the specification called for, and Envirotech contemplated, replacement of the equipment if it failed to meet the specifications. Breedlove's memoranda of October 18, 1977, titled "Financial Exposure," clearly shows Envirotech's understanding of the penalty provision of the heat treatment specifications. Breedlove wrote: "If all modifications fail, owner can demand payment of bond. Henry Parsons believes this would be for actual cost to owner for replacement of our system with another." He then discussed the liquidated damages provision saying: "Fuel and Power Guarantee.... As I see it, there are no prorated liquidated damages, they just keep a flat $50,000.00 if fuel and power guarantees are not met." (Exhibit 435). The court finds that the liquidated damages were limited to a failure to meet the energy consumption requirement of the specifications. (See also Exposure Analyses, Exhibits 8007 and 8007A). Envirotech's understanding of the liquidated damages provision accords with the most reasonable interpretation of the written specifications.[42]

In conclusion, a review of the facts and circumstances in this case does not establish any conduct of Aiken County or Davis & Floyd as a causative factor in the defective design, manufacture, installation, or operation of the heat treatment equipment. The defects were of such a character that any conduct on the part of Aiken County and Davis & Floyd could not have affected them.

### V. THIRD PARTY DEFENDANT'S CLAIMS FOR ATTORNEYS' FEES

Both Bay-Con and Davis & Floyd claim Envirotech is liable for their attorneys' fees, expenses, and costs incurred in connection with the discovery and trial of the heat treatment issue.

---

**42.** Section 15S.16 of the specifications, in referring to the liquidated damages provided for in section 15S.17, stated: "If the system is operable but does not meet the power and fuel design requirements, or in the event that the performance tests are not concluded, the full amount of liquidated damages shall be retained...."

## A. *Bay-Con*

■ Bay-Con's contract with Envirotech specifically provides in Section 46.2: "In the event of litigation or arbitration the prevailing party shall be entitled to recover its legal fees and expenses from the other party." (Exhibit 407).

Envirotech's third party action against Bay-Con alleged that Bay-Con breached its subcontract with Envirotech, and, as a result, Envirotech was sued by Aiken County. This allegation was denied by Bay-Con, and Bay-Con prayed for indemnification for any liability it might have to Aiken County arising out of Envirotech's breach of contract, and for attorneys' fees in defending this action. As stated in Section II above, Bay-Con is entitled to indemnification from Envirotech. The express language of the Bay-Con/Envirotech subcontract provides for the payment of attorneys' fees and expenses to the "prevailing party".

Therefore, I find that Envirotech is liable to Bay-Con for attorneys' fees and expenses in connection with the litigation of the heat treatment issue.

## B. *Davis & Floyd*

■ Unlike Bay-Con, Davis & Floyd has no contractual right to reimbursement of attorneys' fees and expenses from Envirotech. Nevertheless, the court finds Envirotech liable to pay the attorneys' fees and expenses of Davis & Floyd under the equitable rule applied in *Campus Sweater and Sportswear Company v. M.B. Kahn Construction Company*, 515 F.Supp. 64 (D.S.C.1979), *aff'd*, 644 F.2d 877 (4th Cir. 1981).

In *Campus Sweater*, the owner of a warehouse sued the contractor who had built it, the subcontractor who had erected its roof, and the manufacturer of the roofing materials, alleging that the roof was defective. The jury found the manufacturer to be the cause of the roof failure, and the subcontractor was absolved of any fault for the defects in the roof. The court found that the subcontractor who had specifically sought attorneys' fees and expenses in his cross claim, was entitled to an award of the same from the manufacturer.

The *Campus Sweater* opinion cited the following equitable principle to support the attorneys' fee award:

> It is generally held that where the wrongful act of one party has involved another in litigation with a third party, or placed them in such relation to a third party as to make it necessary for him to incur legal expenses to protect his interest, such should be treated as the legal consequences of the original wrongful act and may be recovered as damages.

515 F.Supp. at 110. The court concluded that the subcontractor met the three requirements embodied in this rule: "(1) that [he] became involved in a legal dispute either because of the other party's breach of contract or its tortious conduct; (2) that the dispute was with a third party; and (3) that attorneys' fees were incurred." 515 F.Supp. at 111.

Likewise, Davis & Floyd meets these three requirements. It became involved in this litigation solely because of the delicts of Envirotech. Like the subcontractor in *Campus Sweater*, it has been cleared of any fault in regard to the defective heat exchanger. There was a dispute between Davis & Floyd and a third party, Aiken County.[43] Davis & Floyd did incur attorneys' fees and other expenses as a result of its involvement in litigation over the heat exchanger issue.[44] Therefore, the court

---

**43.** Although it was Envirotech that first brought Davis & Floyd into this suit *via* Rule 14 of the Federal Rules of Civil Procedure, I do not believe *Campus Sweater* is inapplicable merely because Envirotech beat Aiken County to the punch. Aiken County did later make a claim against Davis & Floyd on July 7, 1981. Even though that pleading speaks only in terms of indemnification for Aiken County's liability on issues other than the heat exchanger one, the parties had an understanding that the pleading would encompass a claim by Aiken County against Davis & Floyd for its role in providing the heat exchanger. (Tr. 5/10/84 at 134–37). This latter claim was actually litigated, and the court considers the pleadings amended to conform to the evidence on the issue. Fed.R.Civ.P. 15(b).

**44.** There is presently no evidence before the court from which the court could determine the amount of attorneys' fees and expenses in-

finds that Envirotech is liable to Davis & Floyd for its attorneys' fees and expenses in connection with the litigation of the heat treatment issue.

## VI. DAMAGES

The more credible testimony convinces the court that the heat treatment equipment must be replaced. This was affirmed by Davis & Floyd's engineers. (Tr. 2/9/84 at 103; 12/10/84 at 36). There is no credible evidence in the record that the equipment can be repaired or modified by Envirotech or anyone else so as to comply with the specifications. (Tr. 7/12/84 at 614–16). Aiken County contracted to obtain a system with 100 percent redundancy. The project has two heat treatment units, each designed to handle the twenty million gallon per day average flow predicted for the design year 1995. The project has no bypass because EPA would not allow such a design, and whatever amount of waste is produced by the plant's customers must be processed through the system. (Tr. 9/2/82 at 123–124). Although the flow to the plant is presently averaging only ten million gallons per day, additional wastewater will be received in the future, and the predicted twenty million gallons per day may be reached. (Tr. 9/2/82 at 121–22). I find that the heat treatment equipment as supplied by Envirotech does not provide Aiken County with the backup capability that it had a right to receive.

In addition, replacement was required in Section 15S.16 of the specifications if the equipment did not operate in a practical manner. (Exhibit 421). The INA bond further provided, "that should the principal fail to meet, or elect not to meet, the performance requirements as detailed in Specification Section 15S, ...., then the principal and surety agree to pay obligee's cost in removing existing equipment, or replacing the equipment above, per Specification Subsection 15S.16 ..." [45] (Exhibit 5041). Envirotech acknowledged that replacement was specified in the contract during design and after startup. The following statements are uncontradicted:

1. Mr. Breedlove's memo of 8/3/77 states: "He (a Davis & Floyd engineer) stated the specification was so worded to provide funds to replace the entire heat treatment system with our competitor's system." (Exhibit 425).

2. Mr. Breedlove's memo dated 9/26/77 states: "As you know our exposure on this job is significant. If our heat exchanger design does not function properly as required by the specifications, the Engineer has the option of replacing our system with a competitor's system." (Exhibit 430).[46]

3. Mr. Pecci's memo dated 10/4/77 states: "[I]f our system fails the engineer can replace our system with the competitior's system at a cost to BSP of approximately $1 million." (Exhibit 434).

4. Emmett Davis testified that Mr. Castenholtz told him in February 1978: "Not only are we satisfied that this equipment will work, but we are also furnishing you a bond and if the equipment doesn't work, it is going to be replaced." (Tr. 12/10/84 at 20).

5. The exposure analyses dated 1/3/80 and 1/11/80 provided: "Replace heat exchangers and add circulating water systems." (Exhibits 8007 and 8007A).

It is clear that the parties contemplated that replacement of the heat exchangers would be necessary should the equipment fail to meet the specifications. Therefore, for the reasons herein stated, the court

---

curred. The approach taken in *Campus Sweater* will be adopted here, to wit: the parties to whom fees have been awarded will be asked to submit affidavits as to these amounts for the court's approval, subject to the objections of Envirotech. *See,* 515 F.Supp. at 110.

**45.** Frank Breedlove testified that it was his understanding that "[t]he purpose of the bond

was to provide assurance to Aiken County that there would be money to replace the heat treatment system, if it didn't meet the specification". (Tr. 2/1/84 at 778).

**46.** Breedlove testified: "My understanding of the competition was the Zimpro system." (Tr. 1/26/84 at 592).

finds that replacement cost is the proper measure of damage, since replacement is the only means by which Aiken County can be made whole.

Aiken County offered the only evidence regarding the cost to replace the heat treatment system. Dave Tobin, the sales representative for Zimpro, testified that he originally bid $2,650,000.00 in December, 1976, to supply the heat treatment equipment for the project, and the court feels this is a reasonable replacement cost.[47] (Exhibit 5077 at 75–77). Mr. Tobin further testified that in 1982, the cost to replace the heat treatment system at Aiken County with a Zimpro system which would meet the specifications was $6,191,000.00 (Exhibit 5077 at 80). Mr. Tobin's method of ascertaining this 1982 replacement cost, however, was replete with speculation and mystery, and the court refuses to accept such amount. The plaintiff offered no other evidence, nor is such evidence otherwise in the record, of any other means by which the court could compute the replacement cost at trial.

The 1976 replacement figure of $2,650,-000.00 takes into consideration existing equipment considered salvageable and compatible with the Zimpro system, and it was based on Tobin's onsite review of the equipment in place, review of the specifications, and a review of the original bid. (Exhibit 5077 at 77–79). This quotation includes installation but does not include removal of existing equipment. (Exhibit 5077 at 84). Dixon Teal testified that his company, G.E. Moore Company, had inspected the equipment in September 1982, and could remove the existing equipment for $15,500.00 (Exhibit 5088). Davis & Floyd's Project Manager, Jerry Timmons, testified in 1984 that the cost for Davis & Floyd to check the design submittals and inspect the installation on replacement equipment would be $200,000.00 (Tr. 2/7/84 at 105–106). I find that the total cost to replace the heat treatment system would be $2,865,500.00. This is the amount of actual damages proven by Aiken County.

The court recognizes, as Mr. Tobin testified, that there has generally been an increase in the cost of any product since 1976. Having rejected Mr. Tobin's method of determining that increase, however, the court is not free to speculate. On the other hand, the court refuses to deduct any amount from the total replacement cost of $2,865,500.00 for the use that Aiken County has received from the equipment to date since that use has been troublesome, inefficient, and unsatisfactory. *Cf. Campus Sweater and Sportswear Company v. M.B. Kahn Construction Company*, 515 F.Supp. 64, 103 (D.S.C.1979) (reduction in damages for *satisfactory* performance of roof over part of its estimated life), *aff'd*, 644 F.2d 877 (4th Cir.1981). The figure of $2,865,000.00 represents the amount of actual damages proven by Aiken County to a reasonable degree of certainty.

The court has found that the conduct of Envirotech was fraudulent. Moreover, the documentary evidence showing its relentless pursuit of a greater profit margin was overwhelming on the question of fraud. That evidence disclosed a calculated scheme by Envirotech to convince Davis & Floyd to allow the installation of the sludge-to-sludge heat exchanger despite Envirotech's own serious reservations about the operability of the equipment. Such conduct can not be tolerated in the business community and, when discovered, should be severely punished.

Envirotech was sold to Baker International Corporation in 1982 for the price of $64,789,000.00 (Exhibit 5084 at 29; Exhibit 5085 at 25). This purchase price is good evidence of the ability of Envirotech to pay a punitive damage award. Accordingly, I find that Envirotech is liable to Aiken County for punitive damages in the amount of $1,000,000.00.

## VII. CONCLUSIONS OF LAW

### A. *Liability*

(1) Contract and Warranty.

 A general contractor is liable for any breach of the terms and conditions of

---

**47.** Even Envirotech's witness, Breedlove, estimated that $2,391,000.00 was a maximum expo-

sure in January, 1980.

its contract with the owner. *See generally* 13 Am.Jur.2d *Building and Construction Contracts* § 27. Likewise, an equipment supplier, such as Envirotech, whose contract with the general contractor incorporates by reference the general contractor's contract with the owner, and who also warrants his work to the owner, is liable in contract to the owner. (Exhibit 407, Section 32). Although not a party to the Bay-Con-Envirotech subcontract, Aiken County was clearly the intended beneficiary of the heat treatment system furnished in this subcontract, and may maintain an action thereon. *See, e.g., Wise v. Picow,* 232 S.C. 237, 101 S.E.2d 651 (1958). "[T]he intent and purpose of [Bay-Con and Envirotech] was to confer a direct and substantial benefit upon [Aiken County]." *United States v. Chester Heights Associates,* 406 F.Supp. 600, 604 n. 2 (D.S.C.1976).

A contractor and an equipment supplier are liable to the owner for any breach of express warranties contained in the specifications. *S.C.Code Ann.* § 36–2–313, –318 (1976). *See also JKT Company, Inc. v. Hardwick,* 274 S.C. 413, 265 S.E.2d 510 (1980). In addition, the South Carolina Uniform Commercial Code specifies "Any affirmation of fact or promise, ... made by the seller to the buyer, whether directly or indirectly, which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods conform to the affirmation or promise." *S.C.Code Ann.* § 36–2–313 (1976).

The liability of a surety is measured precisely by the liability of the principal. *Greenville Airport Commission v. USF & G,* 226 S.C. 553, 86 S.E.2d 249, 252 (1955). Thus, in this case, on either a contract or warranty theory, if Bay-Con is liable, then Traveler's is liable; if Envirotech is liable, so is INA.

The standards by which performance is to be judged are those set out in the specifications and agreed to by the parties, including their sureties. *Gurney Industries, Inc. v. St. Paul Fire & Marine Ins. Co.,*

467 F.2d 588 (4th Cir.1972) (interpreting North Carolina law). Moreover, if the owner or its engineer is not an expert in the field, and the contractor possesses superior expertise with respect to the job to be performed and obtains permission to deviate from the job specifications, the contractor impliedly warrants that the performance requirements of the specifications will be satisfied. *J.A. Maurer, Inc. v. United States,* 202 Ct.Cl. 813, 485 F.2d 588, 595 (1973).

As stated earlier in the findings of fact, the heat treatment equipment supplied by Envirotech through Bay-Con to Aiken County does not meet the contract specifications because of plugging in the heat exchanger. Not only is that failure a breach of the contract between Aiken County and Bay-Con, for which Bay-Con and Envirotech are liable, but it also constitutes a breach of the express warranty created by that contract, the INA bond, and the promises made by Envirotech to Aiken County's agent, Davis & Floyd.[48] Therefore, I conclude that both Bay-Con and Envirotech are liable to Aiken County for breach of contract and breach of express warranty.[49] Of course, the respective sureties, Travelers and INA, are also liable to Aiken County up to the amount of their bonds.

In addition, I have found that the conduct of Davis & Floyd was not a causative factor in the failure of the heat treatment equipment to meet the specifications or operate in a practical manner. Thus, the cross-actions of Aiken County, Bay-Con, and Envirotech against Davis & Floyd must fail.

(2) Fraud.

The elements of common law fraud under South Carolina are a "misrepresentation of material fact, made with knowledge of its falsity or ignorance of its truth, and intended by the maker to induce action in

---

**48.** *See* note 21, *supra.*

**49.** By so finding, the court need not decide whether these defendants also breached any implied warranties of merchantability or fitness for a particular purpose.

reliance; lack of knowledge by the other that the fact represented is false, reasonable reliance by the other upon the fact, and harm proximately caused by the reliance." *Miller v. Premier Corporation*, 608 F.2d 973, 980 (4th Cir.1979). Concealment of material facts, where the circumstances impose a duty to disclose, is actionable fraud. *Lawson v. C & S National Bank of S.C.*, 259 S.C. 477, 193 S.E.2d 124 (1972). In construction cases, the courts have held that a contractor has a duty to fully and fairly advise the owner "of the probable consequences which he knew, or should have known from his experience or the nature of the undertaking...." *Mann v. Clowser*, 190 Va. 887, 59 S.E.2d 78, 85 (1950). *See also S.C.Code Ann.* § 36–1–203 (1976) ("Every contract or duty within this act imposes an obligation of good faith in its performance or enforcement").

It is the general rule, and the rule in South Carolina, "that under circumstances which make it the duty of the seller to apprise the buyer of defects in the subject matter of the sale known to the seller but not to the buyer, *suppressio veri* is as much fraud as *suggestio falsi*." *Brooks Equipment & Mfg. Co. v. Taylor*, 230 N.C. 680, 55 S.E.2d 311, 315 (1949) (cited in *Lawson v. C & S National Bank of S.C.*, *supra*). *See also Southern Iron & Equipment Co. v. Bamberg, E. & W. Ry. Co.*, 151 S.C. 506, 149 S.E. 271 (1929).

▇▇▇ In this case, the elements of fraud have been proved by clear and convincing evidence. Envirotech misrepresented to Davis & Floyd, the agent for Aiken County, that 1) the equipment, including spacers, had been tested and did, in fact work; and 2) that the heat exchangers could be effectively cleaned with hydrochloric acid. Envirotech also failed to disclose its internal doubts about the heat exchangers, specifically its own engineering report recommending against the installation of a sludge-to-sludge system. This concealment is actionable as fraud because of Envirotech's superior knowledge and its means of knowledge of these facts compared to Davis & Floyd. *See Giles v.*

*Lanford & Gibson, Inc.*, 285 S.C. 285, 328 S.E.2d 916 (S.C.App.1985). In addition, Davis & Floyd expressly reposed its trust and confidence in Envirotech with reference to the suitability of the heat exchangers [50] so as to give rise to a duty on the part of Envirotech to disclose its doubts. *See Gordon v. Fidelity & Casualty Company of New York*, 238 S.C. 438, 120 S.E.2d 509 (1961). Envirotech intended its acts to induce Davis & Floyd, on behalf of Aiken County, to accept the sludge-to-sludge heat exchangers. Emmett Davis testified that he relied on Envirotech's representations in allowing change order number five and that they were material to this decision. Aiken County would have obtained a heat treatment system that worked but for Envirotech's misrepresentations and fraudulent concealment.

Therefore, I conclude that Envirotech is liable to Aiken County for common law fraud.

### B. *Damages*

#### 1. Actual.

There are two basic rules for computing damages in breach of contract/defective product cases: (1) the value of what was supplied versus what was contracted for; and (2) the cost to replace or fix the defective equipment. Restatement of the Law of Contracts § 346 (1932). The rule to be followed in a particular case depends upon the character and extent of the defect. *Mann v. Clowser*, 190 Va. 887, 59 S.E.2d 78, 86 (1950). Of course, it is well recognized that, if parties agree to a remedy such as replacement, such an agreement shall be effectuated. *S.C.Code Ann.* § 36–2–719 (1976). *See also Hendrie v. Board of County Commissioners of Rio Blanco County*, 153 Colo. 432, 387 P.2d 266, 1 A.L.R.3d 861 (1963); 22 Am.Jur.2d *Damages* § 56; 11 Williston, *Contracts* § 1344 (3d ed.).

In *Globe Refining Co. v. Landa Cotton Oil Co.*, 190 U.S. 540, 543, 23 S.Ct. 754, 755, 47 L.Ed. 1171 (1902), the Supreme Court established the basic rule for dam-

---

**50.** *See* note 21 and accompanying text, *supra*.

ages in a contract action, as follows: "When a man makes a contract, he incurs, by force of the law, a liability to damages, unless a certain promised event comes to pass." The measure of damages is "such consequences as may be reasonably supposed to be in contemplation of the parties at the time of making the contract." 190 U.S. at 544, 23 S.Ct. at 755. In the case of *Gulf States Creosoting Co. v. Loving*, 120 F.2d 195, 201 (4th Cir.1941), the court held: "[A] defendant, who, at the time of the making of a contract, knew all the special circumstances and conditions attendant upon its execution, is liable for those injuries which at that time he had reason to foresee would be the probable result of his breach."

The court acknowledges that the cost of replacement is substantial. However, defendants cannot complain when they had the knowledge that replacement or repairs would be necessary if the heat treatment equipment failed to meet the specifications. *Ivester v. Family Pools, Inc.*, 262 S.C. 67, 202 S.E.2d 362 (1974). *See also Gurney Industries, Inc. v. St. Paul Fire & Marine Insurance Co.*, 467 F.2d 588 (4th Cir.1972); *McCarty v. United States*, 185 F.2d 520, 522 (5th Cir.1950); 22 Am.Jur.2d *Damages* § 37; 25 C.J.S. *Damages* § 34.

■ In this case, replacement cost is the proper measure of damages. The heat treatment system, in its present condition, cannot be operated in a practical manner. The system can operate on automatic only fifty percent of the time that it is processing sludge. In addition, maintenance must be performed on the equipment an average of almost forty percent of the time during which it is used. As stated earlier in section six of this order, the system does not have the back-up capability that Aiken County contracted to receive. Envirotech knew of these special needs of Aiken County regarding the performance of the equipment, and it is beyond doubt that it contemplated that replacement would be neces-

sary if the equipment did not perform as designed.

■ Therefore, I conclude that Envirotech and Bay-Con are liable to Aiken County for $2,865,500.00 in actual damages.[51]

2. Punitive.

South Carolina has long recognized that punitive damages are mandatory in an action for fraud and deceit when the finder of facts is satisfied that a wrongdoer, at the time of the act or omission, was "conscious or chargeable with consciousness of his wrongdoing." *Hardy v. International Paper Realty Corp.*, 716 F.2d 1044, 1047 (4th Cir.1984). The purposes of punitive damages are to punish a wrongdoer and to deter others from conduct of the same or similar nature. *Garner v. Wyeth Laboratories, Inc.*, 585 F.Supp. 189 (D.S.C.1984). The primary considerations in setting the amount for punitive damages are the character of the wrong, the punishment which should be meted out therefor, and the ability of the wrongdoer to pay. *Hicks v. Herring*, 246 S.C. 429, 144 S.E.2d 151, 155 (1965). In the case of *Robertsen v. State Farm Mutual Automobile Insurance Co.*, 464 F.Supp. 876, 879 (D.S.C.1979), this court reviewed at length the methods of determining an appropriate amount for punitive damages.

■ The court is aware that Envirotech was merged into Baker International in 1982. However, the fact that a particular defendant has ceased an objectionable course of conduct is irrelevant to accomplishing the broader purpose of deterring others from similar conduct in the future. *Moran v. Johns Manville Sales Corp.*, 691 F.2d 811, 816 (6th Cir.1982); also, the fact that "culpable" persons may no longer be employed is, likewise, irrelevant. *Id.* at 817.

■ For the reasons stated previously herein, the court has concluded that Envi-

---

**51.** The actual damages for the breaches of contract and warranty are identical to those for fraud in this case. Those for fraud would be measured, generally, by the amount necessary to place the plaintiff in the same position that he would have occupied had he not been defrauded. *Thomas v. American Workmen*, 197 S.C. 178, 14 S.E.2d 886, 888 (1941).

rotech is liable to Aiken County for $1,000,-000.00 in punitive damages.

3. Liability of Surety.

 A surety can limit his liability to the penal sum named therein. 17 Am. Jur.2d *Contractor's Bonds* § 131. A surety is not liable for punitive damages absent a showing of active participation in the fraud, 25 C.J.S. *Damages* § 125(4), and such does not appear in this case. Accordingly, Envirotech's surety, INA, is not liable for any punitive damages.

However, the court concludes that, based on their suretyship contracts, Travelers is liable to Aiken County for the full amount of the actual damage award, and INA is liable up to the sum stated in its bond, $2,070,399.00.

## VIII. CONCLUSION

NOW, THEREFORE, IT IS ORDERED AND ADJUDGED that:

1) Aiken County shall have judgment against Bay-Con, Travelers, Envirotech and INA for $2,865,500.00 in actual damages, plus interest thereon at the legal rate from the date of this order; Bay-Con and Travelers shall have indemnity from Envirotech and INA for any amount they pay in satisfaction of this judgment; INA's liability is limited to $2,070,399.00 plus post-judgment interest on that amount.

2) Aiken County shall recover from Envirotech $1,000,000.00 in punitive damages plus interest thereon at the legal rate from the date of this order.

3) Envirotech shall reimburse Bay-Con and Davis & Floyd for their attorneys' fees and expenses in defending the heat exchanger issue; the determination of the amount of their fees and expenses shall be delayed pending appeal of the judgment herein entered.

4) Aiken County, Bay-Con, and Davis & Floyd shall recover their costs from Envirotech.

IT IS FURTHER ORDERED AND ADJUDGED that the judgment entered on May 10, 1984, directing Envirotech to pay Davis & Floyd the sum of $1,850.00 in costs incurred in copying certain documents, be, and the same hereby is, reaffirmed and incorporated into this order.

Pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, and as discussed earlier in section II.A. of this order, the court finds that there is no just reason for delay in entering this judgment, and the clerk of this court is expressly directed to enter a final judgment in accordance with this order.